GERTRUDE BANISZEWSKI, ALIAS GERTRUDE WRIGHT *v.* STATE.

[No. 31042. Filed Sept. 1, 1970. No petition for rehearing filed.]

*William C. Erbecker, James Manahan, Erbecker & Manahan,* of Indianapolis, for appellant.

*Theodore L. Sendak,* Attorney General, *Douglas B. Mc-Fadden,* Chief Counsel, *Duejean C. Garrett, Richard V. Bennett, Rex P. Killian, Michael V. Gooch,* Deputies Attorney General, for appellee.

ARTERBURN, J.*—This is a criminal charge brought in the Marion County Criminal Court upon an indictment charging the appellant with the crime of first degree murder. The evidence introduced at the trial indicated that the victim, Sylvia Marie Likens, died on October 26, 1965 from a combination of burns, bruises, cuts and a head injury. The evidence shows these injuries were particularly heinous and the trial created considerable sensation and publicity. The victim was found on the date of her death by a police officer in the bedroom of appellant's home where she had been residing in the City of Indianapolis.

The appellant was charged with five other co-defendants including her 17 year old daughter Paula, her 15 year old daughter Stephanie and her 12 year old son John Stephen, with two other co-defendants, Richard Hobbs, age 15, and Coy Hubbard, age 15.

We find there are a number of reasons in combination and in support of each other that compel us to reverse this case.

It is first urged that undue and prejudicial publicity throughout the news media prior to and during the trial created an unfavorable atmosphere such that the defendant could not get a fair trial in Marion County. Two of the principal newspapers of the State are published in the city of Indianapolis and a number of television and radio stations are located in that area. They all took part in a discussion of the case, which had more than the usual sensational features.

The defendant asked for a change of venue from the county because of the prejudicial publicity. The motion for a change

---

* This case was distributed to the writer of this opinion on July 16, 1970.

of venue was denied. Taking into consideration the nature of the charge, its penalty, and the totality of the incidents surrounding the alleged crime, the appellant, in our opinion, presented a very strong case for a change of venue from the environment where she was compelled to go to trial. During the trial the publicity continued and the appellant made a motion for a mistrial and also a motion to withdraw the case from the jury. A table was set up specially for the news media in the courtroom during the trial. The newspapers in Indianapolis carried such headlines as:

"Courtroom Jammed as Torture Trial Opens."
"State Charges Plan to 'Hide' Body of Sylvia."
"Two Women Scuffle For Seat at Trial."
"Likens Trial Judge Allows Standees."
"Sobbing Girl Put Out of Likens Trial."
"Slain Girl's Parents in Courtroom."
"Sylvia Foresaw Death, Sister Sobs."
"Sylvia's Torture Compared to Nazis' Brutality."
"Sickening Likens case Details Told."

In many respects the publicity connected with the case is similar to the famous *Sheppard* v. *Maxwell* case (1966), 384 U. S. 333, 362, 86 S. Ct. 1507, 1522, 16 L. Ed. 2d 600, 620. In that case the United States Supreme Court stated:

". . . From the cases coming here we note that unfair and prejudicial news comment on pending trials has become increasingly prevalent. Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances. Of course, there is nothing that proscribes the press from reporting events that transpire in the courtroom. But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should continue the case until the threat abates, or transfer it to

another county not so permeated with publicity. In addition, sequestration of the jury was something the judge should have raised sua sponte with counsel. If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures."

It is next urged that the defendant was not given the constitutional protection and warning provided in *Escobedo* v. *Illinois* (1964), 378 U. S. 478, 84 S. Ct. 1758, 12 L. Ed. 2d 977. The facts show that police officers entered the home of the appellant, questioned her, and took certain notes she claimed the decedent had given her. The police officers then took the appellant to the police station that evening for further questioning, kept her overnight in jail, brought her before a police magistrate the next morning, and then told her that she need not say anything and that she was entitled to have an attorney. They did not state that she was entitled to have an attorney if she was a pauper and that the attorney was entitled to be present during the questioning. They proceeded then to question her and take her written statement. We find the following testimony of Sgt. Kaiser relevant as to the denial of defendant's constitutional rights:

"Q. At the time you talked to her did you effectively warn her of her constitutional rights to remain absolutely silent?

A. Not at that time.

Q. You did not tell her anything she might say to you could be used against her?

A. No, sir, I did not.

Q. How long did you talk to her there at the house?
A. Approximately ten or fifteen minutes.

Q. Ten of fifteen minutes. Then what did you do with her?
A. I asked her if—after I made my investigation at the scene, I asked her if she would come down to the Homicide Office and give me a statement pertaining to the death of Sylvia Likens.

Q. Did she go to Homicide and give you a statement then?
A. Yes, pertaining to the death of Sylvia, as she told it.

Q. Then she went to one of the police courts?
A. That is correct.

Q. Were you there in police court?
A. Yes, sir, I was.

Q. And in front of what judge?
A. Judge Harry Zaklan.

Q. You were present. Was there a hearing?
A. I really don't know, sir.

Q. Was it waived over to Grand Jury?
A. No, sir, it was not.

Q. Was there a hearing?
A. I really don't recall.

Q. Did the court appoint an attorney for her?
A. Not at that time.

Q. Did she have an attorney?
A. She was given permission the previous night to call an attorney.

Q. You gave her permission to call an attorney?
A. Yes.

Q. Did she call one?
A. I believe she did.

Q. Were you present?
A. No, when I took her upstairs to the lockup I informed the turnkey the lady wanted to call her attorney, to give her permission to call one.

Q. Then she did make a call the first night?
A. Yes.
Q. Then you knew she had an attorney?
A. No, after court I questioned her and she stated she did not think the attorney wanted to take the case.
Q. You knew she had sought the advice of counsel?
A. That is right.
Q. At that time did you effectively warn her of her constitutional rights to remain silent and say nothing?
A. Yes."

It occurs to us that the appellant in this case was not given the opportunity to have counsel at the proper time nor was she told that the State would furnish counsel if she was unable to secure counsel because of financial conditions.

Appellant filed a motion for a separate trial from her co-defendants, which was denied by the court. It appears, however, that her daughter Stephanie, who also asked for a separate trial and was denied, was later granted a separation from the other co-defendants. The record does not show whether or not she was ever tried. The contention is made by the appellant that this was done to get the daughter, Stephanie, age 15, to testify against the mother. The record does show Stephanie turned State's evidence and testified against her mother.

Appellant's motion for a separate trial was based upon the allegations that the four other defendants who were to be tried with her had made statements implicating her and these statements would be offered in evidence against these co-defendants and would thus be presented to the jury against her, implicating her, without the possibility of cross-examining the co-defendants who might not take the stand. It was stated that to instruct the jury to disregard these implicating confessions and statements would be insufficient to overcome the prejudice and damage done to appellant's defense. The record shows this is exactly what happened. The appellant

took the stand and was cross-examined with reference to these statements made by the co-denfendants, only one of whom took the witness stand and who could be cross-examined. The one that did take the witness stand, Richard Hobbs, repudiated the portion of the written statement which he had given, in which he said that appellant stated she would kill the Likens girl. He blatantly admitted he had lied on cross-examination as to such matter.

Under the situation where the co-defendants who made the statement did not take the stand the appellant had no defense against their implicating confessions and statements except to deny them. Yet such statements were hearsay so far as the appellant's case was concerned. Her only defense was that of passively relying upon the effectiveness of the admonitions of the court that the jury should not consider the statements of the other co-defendants in deciding appellant's guilt.

In this case no conspiracy between the co-defendants was charged and there was no responsibility for the statements made by one implicating the other and such statements normally would not be admitted.

We recognize a very broad discretion has been granted the trial courts in determining whether separate trials should be granted, and such discretion is rarely questioned by appellate courts. However, in our opinion a separate trial should be granted where the possibility plainly exists that co-defendants have made serious statements implicating other co-defendants and such statements will be introduced as evidence in the trial. Such conditions force a defendant in many cases unwillingly to take the stand to defend himself against such statements, although they are pure hearsay. We seriously doubt that the instruction or admonition of the court under such situations. as revealed here would be sufficient to avoid the prejudicial effects in the jurors' minds in a crime as serious as that in this case. The ability of a jury to render justice under such circumstances

has been seriously questioned. *United States* v. *Haupt* (7th Cir.) (1943), 136 F. 2d 661; *Krulewitch* v. *United States* (1949), 336 U. S. 440, 69 S. Ct. 716, 93 L. Ed. 790 (Concurring Opinion).

The United States Supreme Court has said with reference to a fair trial:

> ". . . Nevertheless, as was recognized in *Jackson* v. *Denno, supra,* there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Compare *Hopt* v. *Utah, supra; Throckmorton* v. *Holt,* 180 U. S. 552, 567; *Mora* v. *United States,* 190 F. 2d 749; *Holt* v. *United States,* 94 F. 2d 90. Such a context is presented here, where the powerfully incriminating extrajudicial statement of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed. *Pointer* v. *Texas, supra." Bruton* v. *United States* (1968), 391 U. S. 123, 135, 88 S. Ct. 1620, 1628, 20 L. Ed. 2d 476, 485.

Finally it is pointed out that the appellant's motion for a new trial was overruled, not by the regular judge who heard the case, but by a judge pro tempore. The record shows no explanation or reason for this. Under Rule 1-9 of this Court, the judge who presides at the trial shall rule on the motion for a new trial if available. The rule further provides that the unavailability of the judge shall be made a matter of record. This was not done in this case. The remedy in such instance would be to order the ruling of the judge pro tempore on the motion for a new trial to be vacated and the matter be referred again to the presiding judge.

However, in this case this would be a needless and useless procedure, since the case must be retried.

Looking at the record presented to us in this case with the prejudicial atmosphere prevailing before and during the trial, the refusal to grant the appellant a change of venue, the refusal during the trial to declare a mistrial because of the publicity, and the denial of a separate trial to the appellant under the circumstances enumerated above, we feel compelled to conclude that the appellant did not receive a fair trial. We think justice would be better served if this case were retried in a more temperate atmosphere.

For the reasons stated, the judgment of the trial court is reversed and a new trial ordered.

Hunter, C.J. and DeBruler, J. concur; Jackson, J. concurs in result. Givan, J. not participating.

NOTE.—Reported in 261 N. E. 2d 359.

---

\* This case was distributed to the writer of this opinion on July 16, 1970.