FRANK FISHER *v.* STATE OF INDIANA.

[No. 771S198. Filed January 8, 1973.]

Phillip W. Brown, of Shelbyville, for appellant.

Theodore L. Sendak, Attorney General, Stephen D. Clase, Deputy Attorney General, for appellee.

DeBruler, J.—This is an appeal from a conviction of voluntary manslaughter (I.C. 1971, 35-13-4-2, being Burns § 10-3405) at a trial by jury in the Shelby County Superior Court, Judge George Tolen, presiding. Appellant was sentenced to from two to twenty-one years in prison. He bases his appeal on the following grounds: (1) The evidence was insufficient to sustain the verdict of the jury; (2) The trial court should have declared a mistrial because of certain newspaper stories concerning the trial; (3) Photographs of appellant's truck admitted at trial was evidence seized in violation of the Fourth Amendment and should have been suppressed; (4) The court erred in overruling the appellant's motion for a mistrial based on Detective Frank Zunk's reference to a "record"; (5) It was error for the court to permit Detective Zunk to explain the meaning of the term "negative" as it was used in a police laboratory report; and (6) the court erred in giving several of the State's instructions and further erred in refusing to give three tendered instructions of the appellant.

Evidence introduced by the State at the trial showed that one Virginia Jefferson was sitting on the front porch of her mother's house located at 2015 Sheldon Street in Indianapolis on October 19, 1969. At about 4:30 p.m. on that day she heard a shot fired from the direction of the C & C Garage located at about a block away at 19th Street. At the same instant she heard something strike the house on the side facing toward the garage. Mrs. Jefferson looked toward the sound of this shot and saw a red pick-up truck parked in the alley of the C & C Garage with two men standing next to the truck. She did not recognize the men but stated that both were black and one was not wearing a shirt. They appeared to be arguing although she could not hear exactly what they were saying. She went inside to call the police and while so doing heard two or three more shots. The police arrived about fifteen minutes later and found a bullet hole in the side of the house. They looked around inside the house for the spent bullet but were unable to find it at the time and left. Some time later she testified that they returned and found the bullet imbedded in the opposite wall from that of entry.

Officers Blackburn and Snyder of the Indianapolis Police testified that they were dispatched to the house at 2015 Sheldon Street and arrived at 4:45 p.m. They discovered what appeared to be an entry bullet hole in the side of the house but were unable to find where the bullet had lodged. They left the scene and drove through the area looking for indications of who had fired the shot. At 5:10 they were summoned to the C & C Garage alley by a radio call where they found a black male with no shirt on and two bullet wounds, one in his abdomen and another in his neck. They subsequently returned to the Sheldon Street address where they found the spent cartridge which was identified as a .38.

Mr. Augustus Thomas testified that he passed by the alley next to the C & C Garage sometime in the late afternoon about October 19, 1969, and noticed a red pick-up truck parked

there with two men standing next to the truck. Mr. Thomas went to his house several lots away from the garage and fell asleep. He was awakened shortly by John Cooper, a friend, who told him of the excitement at the house on Sheldon Street. They walked up to the house and watched the police investigating. After a few minutes they returned to the area of the garage and found the body of a black man without a shirt in the alley. They phoned for the police.

John Cooper stated that he was napping in the C & C Garage while waiting for a friend to come and help work on his car, when he was awakened by a sharp noise which sounded like a rock landing on top of the roof. He looked out the back window of the garage and saw a red Chevrolet pick-up truck parked in the alley with two men standing next to it. The men were arguing about a motorcycle and he identified one of the men as the appellant, Frank Fisher. Mr. Cooper walked away from the window toward the front of the garage at which point he heard a gunshot. He ran back to the window where he saw and heard the appellant still yelling about a motorcycle. He then ran to the front of the building to make sure the front door was locked and heard another shot. When he next looked out the back window Fisher was putting something in his jacket pocket. Mr. Cooper again ran to the front of the building and saw Fisher drive away in the pick-up truck. About ten minutes later he went outside and saw the police at the Sheldon Street house. He got his friend, Augustus Thomas, and they went to Sheldon Street to find out what was happening. On the way back they discovered the body in the alley near where the argument had taken place.

There was further testimony from the appellant's brother, James Fisher, that Frank owned a red Chevrolet pick-up truck and that he owned a motorcycle which was stolen shortly before October 19, 1969.

Detective Zunk of the Indianapolis Police Department stated

that a red pick-up truck was found in the lot next to Frank Fisher's house at 3:00 a.m. on October 20, 1969, and that Fisher was arrested at another location about one week later.

Doctor James A. Benz further testified that the decedent, Herman Fitzgerald, had died at the hospital shortly after being admitted from two gunshot wounds inflicted by a .38 caliber gun.

When this Court is called upon to decide a question concerning the sufficiency of the evidence it is well settled that we will not weigh the evidence nor pass upon the credibility of any witnesses at the trial. *Smith* v. *State* (1970), 254 Ind. 401, 260 N. E. 2d 558. Rather our well defined task is to consider that evidence most favorable to the State, together with all logical and reasonable inferences which may be drawn therefrom, and decide whether there is substantial evidence of probative value from which a trier of fact could reasonably infer that the appellant was guilty beyond a reasonable doubt. *Smith* v. *State, supra; Turner* v. *State* (1972), 259 Ind. 344, 287 N. E. 2d 339; *Cravens* v. *State* (1971) 257 Ind. 381, 275 N. E. 2d 4. We find no lack of evidence upon any material element of the crime with which we are concerned here.

The elements of voluntary manslaughter as set out by Burns § 10-3405, *supra,* are a voluntary killing of a human being, without malice, in a sudden heat. The evidence at the trial clearly established that Herman Fitzgerald died of gunshot wounds. Two witnesses heard gunshots from the area where his body was found and heard arguing between two men standing next to a red pick-up truck. Mr. Cooper stated that the appellant Frank Fisher was one of the men arguing and that he was so arguing during the time when the gunshots were heard. He saw Frank Fisher leaving alone in his red pick-up truck immediately following the gunshots and he and Mr. Thomas discovered the body several minutes later. A jury presented with such evidence could properly draw the neces-

sary inferences to sustain a conviction of voluntary manslaughter.

Appellant's next contention is that the trial judge should have declared a mistrial because of two stories which appeared in the Shelbyville Newspaper before the trial. The first story appeared a week before the commencement of trial and the other a day before the start of the voir dire of prospective jurors. Both stories contained a reference to the fact that the appellant was also being charged with a second murder in Johnson County.

Appellant cites the case of *Baniszewski* v. *State* (1970), 256 Ind. 1, 261 N. E. 2d 359, as support for his position. At the outset we should note that this is not a situation where a crime is so gruesome or coverage by the media so extensive and sensational that the appellant cannot be said to be able to obtain a fair trial in a certain community. The trial here had already been venued out of the county where the crime had been committed. The stories themselves are apparently factual in nature with only a passing reference to the second charge. We do not believe these two short stories of themselves create the danger of a community "permeated with publicity" warned against by both the United States and the Indiana Supreme Courts. *Sheppard* v. *Maxwell* (1966), 384 U.S. 333, 86 S. Ct. 1507, 16 L. Ed. 2d 600; *Baniszewski* v. *State, supra.*

Appellant apparently contends, however, that the mere fact that stories appeared in a county newspaper which contained factual material prejudicial to himself and which would not be admissible at trial makes it per se impossible for him to have an impartial jury in that county. The record here discloses that appellant failed to question the prospective jurors concerning any possible prejudicial effects of the articles. Moreover appellant did not attempt to inquire whether any juror had either read or heard of any newspaper articles about the case. Furthermore the trial judge, upon

the request of the appellant, carefully instructed the jury panel before the start of the trial that they should disregard any newspaper stories concerning the appellant or the coming trial. We cannot reverse the decision of a jury on the mere speculation that one or more of its members might have read a newspaper article containing some possibly prejudicial facts. *Harris* v. *State* (1967), 249 Ind. 681, 231 N. E. 2d 800. Appellant here had ample opportunity during the voir dire of the prospective jurors to determine if any of them had been aware of the articles and he failed to do so. It has long been a law of this State that the appellant must bear the burden of demonstrating some prejudicial effects from coverage by the media, either by the sheer quantity and quality of the coverage as discussed in *Baniszewski* v. *State, supra,* or in instances of more temperate reporting, by showing that the jurors had read the stories and would probably be prejudiced by them. *Harris* v. *State, supra; Prophet* v. *State* (1960), 241 Ind. 57, 168 N. E. 2d 189, cert. den'd 81 S. Ct. 809 (1961). We cannot make the bold assumption here that some jurors must have been aware of the article. Nor can we make the even bolder assumption that the jurors in this case were unable to comply with the court's instructions to disregard anything they may have read or would in the future read in the newspapers about the trial.

Appellant's third contention deals with the admittance into evidence of several photographs of appellant's truck. Detective Zunk of the Indianapolis Police Department had been assigned to this case and had questioned several people in the neighborhood concerning the incident. After returning to his office at about 3:00 a.m. on the 20th of October, he received an anonymous phone call giving him the name of appellant. After finding appellant's address he drove to the residence and noticed a red pick-up truck parked in a lot next to the house. Detective Zunk knocked on the door of the house but received no answer. He then called for assistance from the police photographic unit who subsequently arrived and who took

several pictures of the truck. The evidence at the trial also indicated that the police entered on to the adjoining lot to take pictures of the truck.

The first step in the analysis of this problem is to decide if the facts here constitute a search of the truck owned by appellant. We think not. The evidence introduced by the State were all pictures taken by an ordinary camera of the outside of the truck. The pictures showed no more than anyone standing near the truck would be able to see with his own eyes. There was no prying into private places, exploratory investigations or violations of personal areas by the police in taking these photographs. Taking ordinary pictures of a vehicle sitting in open view in a vacant lot is not of itself a search of that vehicle within the meaning of the Federal or State Constitution. *Katz* v. *U.S.* (1967), 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576; *McCoy* v. *State* (1960), 241 Ind. 104, 170 N. E. 2d 43; *Lindsey* v. *State* (1965), 246 Ind. 431, 204 N. E. 2d 357. Neither is appellant correct in his contention that the entry by the police upon this vacant lot in order to photograph the truck constituted a search of the lot as contemplated by the Fourth Amendment. The testimony disclosed that the lot was immediately adjacent to the public roadway, that it was located in the City of Indianapolis, and that there were no improvements upon it. There were no fences on the lot nor any no-trespassing signs. The lot was described as "vacant" and it was undeveloped, and not under cultivation, or being used as a private yard or garden. It was not being utilized for any observable purpose. The testimony also disclosed that the officers in photographing the truck did not closely inspect the lot itself. They only stood on the lot to photograph the truck which was clearly visible from the public roadway. The officers did not pry into private or personal areas on the lot for anything concealed. *Lindsey* v. *State, supra*. We reach our conclusions here from the character of his particular lot, and the minimal nature of the conduct of the police while upon it.

Next appellant contends that the trial court should have declared a mistrial because Detective Zunk referred to a certain "record" during his direct examination. Detective Zunk testified that while at police headquarters he received a phone call giving him the name of the accused. Attorneys for the appellant objected on the grounds that such testimony was hearsay. The objection was properly sustained and the judge admonished the jury to disregard the testimony. When asked what he did next the officer said he went to the file room and "pulled the record of," at which point he was stopped by the objections of appellant's counsel. Appellant made a motion for mistrial which was denied after argument outside the presence of the jury. The judge admonished the jury to disregard such testimony.

Appellant urges that this reference was so prejudicial that it could not be cured by the instructions of the court and hence a mistrial was mandated. We agree that uncalled for responses by witnesses which notify a jury that a defendant has been convicted of prior crimes may at times so irrevocably prejudice a jury that a mistrial would be necessitated. *White* v. *State* (1971), 257 Ind. 64, 272 N. E. 2d 312. We do not feel however that these facts required so drastic a remedy. The officer's testimony at the time it was interrupted did not connect the name of the accused with the reference to a record, nor was this connection ever made. Moreover we are assured that this testimony did not necessarily connote to the jury the existence of prior crimes committed by appellant. Their reference, although somewhat improper and best avoided, is ambiguous and adequately cured by the instruction of the court to disregard it.

Appellant's fifth contention is that the trial court committed error when it allowed Detective Zunk to explain the meaning of the term "negative" as used in a police laboratory report. The report concerned a test conducted by the police department which was designed to determine

the existence or nonexistence of blood stains on the fender portion of appellant's truck. The State did not choose to use the test in its case, but on cross examination of Officer Zunk appellant introduced a report of the results which were denoted as "negative." The prosecution, on redirect, asked Officer Zunk if he worked often with the police lab and whether or not he was familiar with their procedures. He replied in the affirmative. He was then asked if the term "negative" in these police reports connoted any particular meaning and he again answered yes. The officer testified that the meaning of the term as used by the lab meant inconclusive; that the existence or non-existence of blood could not be determined with certainty. Appellant claims that allowing the officer to explain the meaning of the term was allowing a conclusion on his part. Again we cannot agree. This was a word with technical meanings to police officers and crime laboratory technicians. The bare word "negative" on the report was apparently misleading or at best ambiguous. Officer Zunk was qualified as an expert in the field and testified that the term had a technical meaning of which he was aware. We find no error in his testifying as an expert on this point. He was merely fulfilling the function of an expert witness by explaining the meaning of technical terms, within his province of special knowledge, to a jury. This was not opinion testimony but expert testimony which was admitted after the proper foundation for it had been laid.

Finally, appellant asserts that several instructions given by the court were erroneous as was the court's refusal to give several instructions offered by appellant.

Appellant objects to the Court's instruction number fourteen which was as follows:

"Where the deliberate use is made by a sane person of a deadly weapon, such as a gun or a pistol, in committing an assault and battery in such manner as would be reasonably calculated to take or destroy life, then the law permits

you to infer from such facts that an intention existed to take life from the act itself; and if you should further find that an assault and battery, if any, was done purposely, without justification, legal excuse or reasonable provocation then under such findings of facts you may also infer malice on the part of the person committing the assault and battery from the act itself."

The basis of appellant's ground for reversal is that the court should not have used the term "assault and battery" because the jury could have been mislead into thinking that if an assault and battery was committed then they could automatically infer sufficient malice or intent to take life. Although the term assault and battery may not be the best phrase to instruct on this point, because of possible confusion as to its technical or legal meaning, we find no danger that the jury would be misled to the extent of confusing the type of intent required for a conviction of voluntary manslaughter. Immediately after the term was used the court specifically qualified its use by adding the words "calculated to take or destroy life" which clearly indicates to the jury the correct law of intent for this charge.

Appellant further objects to instructions numbered four, six and seven given by the court which dealt with the definitions of first degree murder, voluntary manslaughter, and involuntary manslaughter. Appellant does not disagree with the main body of the instructions but does claim that the phrase which instructs the jury that they must find these acts were committed "within five years before the return of the indictment" in reference to manslaughter and "sometime before the return of the indictment" in reference to murder were incorrect in view of the fact that alibi notices had been filed in this proceeding pursuant to I.C. 1971, 35-5-1-2, being Burns § 9-1632. Both the prosecution and defense stipulated that the time of crime would be established between 4:30 p.m. and 5:00 p.m. on October 19, 1969, and all the evidence submitted at the trial was in accordance with this time frame.

The requirements of the statute were therefore complied with in every way. Appellant does not dispute that the evidence was within the time stipulated nor does he claim the statute was violated in some other aspect, but he does claim that the instructions objected to contain references to a time frame which was overly broad in light of the alibi notices.

The references in these instructions to a certain time limit before the return of the indictment are, of course, instructions given to enforce the statutes of limitations, I.C. 1971, 35-1-3-1, and 35-1-3-4, being Burns §§ 9-301 and 9-304. It is a necessary burden of the State to establish that the crime charged was committed within the statute of limitations. *Woods* v. *State* (1968), 250 Ind. 132, 235 N. E. 2d 479; *Dickinson* v. *State* (1880), 70 Ind. 247. It is not error to instruct upon the statute of limitations, even though an alibi notice has been introduced into the case. It certainly would not be proper to enforce the alibi statute by eliminating the instructions on the statute of limitations. It should also be pointed out that the court had a separate and distinct instruction on the alibi aspect of this case which adequately called the attention of the jury to appellant's alibi defense and the time element involved. Court's instruction number eighteen states in part:

> "You are instructed that the defendant in this case has filed his notice of alibi and offered evidence tending to prove that, at the time of the alleged offense, the defendant Frank Fisher was at a place other than the place where the alleged offense occurred."

Appellant further objects to the last sentence of instruction number thirty-one. This instruction dealt with the duty of a juror to consult and deliberate with his fellow jurors. Appellant finds no fault with this part of the instruction but states that the sentence, "A verdict must be unanimous.", found at the end of this instruction, misleads the jury into believing that they must agree on a verdict. This

argument bears no merit whatsoever. It is beyond citation that the verdict of a jury, for either conviction or acquittal, must be unanimous and it can in no way be said to constitute error to so instruct.

Appellant next asserts that the court's instruction number thirty-two was erroneous. The instruction was as follows:

"If after consideration of all the evidence you find that the testimony of two or more witnesses is in irreconcilable conflict and you further find it is necessary to resolve the conflict to determine whether or not defendant did the act as charged, and you further find that you are unable to determine which of said witnesses to believe, you should acquit the defendant, for under such circumstances, you would have a reasonable doubt of his guilt."

Appellant claims the phrase "should acquit the defendant" should have been "must acquit the defendant." We feel that any semantic discrepancies of this proportion are not error by the court. The instruction clearly and adequately confers the meaning of the law on this point to the jury. A trial court need not be restricted to the use of certain sacred phrases as long as the instruction clearly states the correct legal principle.

Appellant also claims error by the court in refusing to give several instructions tendered by him. His tendered instruction number twenty-one reads as follows:

"The court instructs you that when the State of Indiana relies upon circumstantial evidence in order to secure a conviction if any one fact necessary to a conclusion of guilt is totally inconsistent with the hypothesis of guilt of the accused it breaks the chain of circumstantial evidence upon which the inference of guilt of the accused depends; and, however plausible or apparently conclusive the other circumstances may be the charge must fail and you must find the defendant not guilty."

The court's instruction number twenty-four given to the jury states in part:

"To justify a conviction of the defendant in this case, on circumstantial evidence, the circumstances disclosed by the evidence must be of such character and strength as to exclude every reasonable hypothesis except that of the defendant's guilt. If the circumstances disclosed by the evidence can be explained on any reasonable theory consistent with the defendant's innocence he is entitled to an acquittal."

It is apparent to us that the law on sufficiency of proof in a circumstantial evidence case was adequately covered in the court's instructions. When the instruction given is an adequate statement of the law it is not error to refuse to give a similar instruction. *Shack* v. *State* (1972), 259 Ind. 450, 288 N. E. 2d 155; *Doss* v. *State* (1971), 256 Ind. 174, 267 N. E. 2d 385.

Appellant's last ground for reversal concerns the refusal of the trial court to give his tendered instructions twenty-three and twenty-four. Both of these instructions concern the failure of the appellant to flee at the time of the arrest and informs the jury that they may consider this in their deliberations. The appellant was arrested several days after the shooting at a location other than his home. The fact that a defendant flees or does not flee does not indicate either guilt or innocence of itself and instructions calling attention to this situation may only serve to highlight an otherwise ambiguous occurrence. It was not error to refuse to give such instructions here.

Judgment affirmed.

Arterburn, C.J., Givan, Hunter and Prentice, JJ., concur.

NOTE.—Reported in 291 N. E. 2d 76.