Tyreese **ROWAN**, Appellant
(Defendant below),

v.

**STATE of Indiana, Appellee**
(Plaintiff below).

No. 380S76.

Supreme Court of Indiana.

March 5, 1982.

F. Thomas Schornhorst, Bloomington, for appellant.

Theodore L. Sendak, Linley E. Pearson, Attys. Gen., Janis L. Summers, Deputy Atty. Gen., Indianapolis, for appellee.

HUNTER, Justice.

The defendant, Tyreese Rowan, was charged with the crimes of murder, criminal deviate conduct, and burglary. By means of a separate information, the state also asked for the death penalty. The jury found defendant guilty of voluntary manslaughter, a class B felony, Ind.Code § 35–42–1–3 (Burns 1979 Repl.), criminal deviate conduct, a class A felony, Ind.Code § 35–42–4–2(b) (Burns 1979 Repl.), and burglary, a class B felony, Ind.Code § 35–43–2–1 (Burns 1979 Repl.). Defendant was sentenced to consecutive terms of twenty, fifty, and twenty years respectively.

The following fifteen issues are presented to this Court in this appeal:

1. Whether the evidence was sufficient to sustain the convictions;

2. Whether certain evidence should have been excluded because of questions as to the chain of custody;

3. Whether it was error to admit testimony of certain police officers concerning defendant's post-arrest statements and silence;

4. Whether there existed probable cause for defendant's arrest;

5. Whether certain expert opinion testimony concerning a hair sample was erroneously admitted into evidence;

6. Whether certain photographs of the decedent's body were erroneously admitted into evidence;

7. Whether the trial court erred in ruling that a defense witness could not testify because of a violation of a separation of witnesses order;

8. Whether evidence of defendant's prior conviction was properly admitted;

9. Whether the court erred in refusing to give defendant's final instruction No. 2 which would have defined "person";

10. Whether several of the trial court's instructions concerning reasonable doubt were erroneous;

11. Whether the trial court's final instruction concerning the jury's duty was erroneous;

12. Whether the filing of the request for the death penalty was erroneous;

13. Whether the questioning of the prospective jurors concerning their attitudes toward capital punishment was erroneous and resulted in an erroneous jury selection;

14. Whether defendant was properly convicted and sentenced on the criminal deviate conduct charge as a class A felony; and

15. Whether defendant was denied due process of law because of the incomplete nature of the police investigation.

A summary of the facts from the record favorable to the state shows that the body of Evelyn Ayer, a 72 year old retired school teacher who lived alone, was found in her home in Rockport, Indiana, by her nephew Leland Ayer on the afternoon of January 7, 1979. Mr. Ayer had been called by friends who had become concerned when they were unable to contact Miss Ayer that day. Mr. Ayer found his aunt's body lying on the living room floor near the fireplace and thought she had died of a heart attack because of her history of heart disease. He called a funeral home and then waited in the porch area with his wife and some neighbors until the body had been removed. Mark Boltinghouse, one of the funeral home employees, testified that he found the dece-

dent's body unclothed from the waist down. Her garments were piled on top of her stomach and she had blood on her hands and in her hair. Boltinghouse also noticed that she had a cut above one eye.

Mr. Ayer returned to the living room after the funeral home employees left and saw that there was blood on the carpet where his aunt's head had been. He then began to look around for signs of forced entry or violence. He found a red pocket comb lying near the couch and saw his aunt's shoes on the floor. A footstool was overturned and had blood on it. In his aunt's bedroom, Ayer found two open purses lying on the floor, bandaids scattered on the top of the dresser along with a bandaid container, and other items on top of the dresser disarranged. After looking in the purses and around the room, Ayer concluded that his aunt's billfold, glasses, and keys were missing. He also made a closer inspection of the back door and found that it appeared to have been forcibly opened. The inside framing was cracked and paint fragments were on the floor. One of the neighbors told Ayer he had found one set of footprints in the snow going around the house and up to the living room window.

At this point, Mr. Ayer called the funeral home and a decision was made to call the county coroner to investigate the death. However, the preliminary embalming process had already been partially completed. The coroner, Elbert Decker, made a brief inspection of the body and then went to the decedent's home accompanied by two police officers. They inspected the scene in the living room and the bedroom. Decker took some Polaroid photographs in the residence that evening, but they did not develop properly. He collected the red comb and some scrapings for evidence and ordered an autopsy.

Dr. Albert Venables, a forensic pathologist, performed the autopsy the next morning, January 8, 1979. He found no evidence of a heart attack. The fatal injury, in his opinion, was a blow to the back of the decedent's head by a blunt instrument with a curved surface. This produced an inden-

tation of the skull and an internal brain hemorrhage that caused the death. He also noted a laceration on the right forehead which was caused by a blunt instrument. He further noted a bruise on the upper lip, a bruise on the right eye, and a tooth knocked out of a dental plate, which injuries in his opinion were caused by a blow, or blows, from a fist. Finally, he noted a tear on the left side of the labia majora in the vaginal area and blood in the area of the tear.

Miss Ayer's billfold was later found frozen in the snow in a nearby schoolyard. Her keys were found in a yard across the street from defendant's mother's home. Police officers found a hair on Miss Ayer's back door frame which was later shown to have characteristics matching those of defendant's hair. The bandaid can was dusted for fingerprints and one identifiable print was found which matched the known fingerprints of defendant. One witness testified that he had seen defendant with a red pocket comb prior to the crime. The time of death was established as around 6:00 p. m. to 9:00 p. m., on January 6, 1979. Although defendant lived and worked in Texas, he was in Rockport visiting relatives during the early part of January, 1979. One witness saw defendant about two blocks from the decedent's house at 5:00 p. m. on January 6, 1979. Two other witnesses saw defendant near his mother's house which was also near the decedent's house between 8:00 p. m. and 10:00 p. m. that evening. The state police fingerprint identification specialist was able to identify the print on the bandaid can as matching a known fingerprint of the defendant. Police arrested defendant in Texas on February 20, 1979, and he was returned to Indiana the following day.

At the trial, defendant testified that he had gone to Owensboro, Kentucky, with friends in the early afternoon of January 6, 1979. He returned in the late afternoon and went to his mother's house. From there he went to an aunt's house and played cards and talked with relatives and friends until 10:00 p. m. or 10:15 p. m. He testified he then walked to town, talked with various people, and was given a ride home about half an hour later. Other defense witnesses generally corroborated defendant's testimony but were uncertain as to how long he remained at the card game.

## I.

■ Defendant first contends that there was insufficient evidence to support the verdicts. Our standard for reviewing sufficiency claims is firmly established; on appeal the reviewing court does not weigh the evidence or judge credibility. We consider only that evidence most favorable to the state, together with all reasonable and logical inferences to be drawn therefrom. If there is substantial evidence of probative value to support the conclusion of the trier of fact, the verdict will not be overturned. *Walton v. State*, (1980) Ind., 398 N.E.2d 667; *Wofford v. State*, (1979) Ind., 394 N.E.2d 100; *Poindexter v. State*, (1978) 268 Ind. 167, 374 N.E.2d 509. The triers of fact may draw reasonable inferences from facts established either by direct or circumstantial evidence, and a guilty verdict may be based solely upon circumstantial evidence. *Harris v. State*, (1981) Ind., 425 N.E.2d 112; *Webster v. State*, (1978) Ind., 383 N.E.2d 328.

■ We have also clearly held that in a case based wholly upon circumstantial evidence, this Court does not have to find that the circumstantial evidence is adequate to overcome every reasonable hypothesis of innocence but only that an inference may reasonably be drawn therefrom which supports the finding of the jury. *Hall v. State*, (1980) Ind., 405 N.E.2d 530; *Spears v. State*, (1980) Ind., 401 N.E.2d 331; *Parks v. State*, (1979) Ind., 389 N.E.2d 286. This basic standard of review has clearly been held as the rule consistently followed by this Court, although we have also recognized that there is a distinction between the law regarding circumstantial evidence which governs trial courts and that which governs appellate courts in Indiana. *Spears v. State, supra; Ruetz v. State*, (1978) 268 Ind. 42, 373 N.E.2d 152. The jury's verdict should be

affirmed in the instant case if there is substantial evidence of probative value which supports the finding of each element of the charged offenses.

Defendant first argues that there was insufficient evidence to establish his presence at the scene of the crime. The state's case on this point rested on the following circumstantial evidence: a fingerprint which matched a known print of the defendant found on a bandaid can in the decedent's home; a hair sample found on the back door frame which matched the major characteristics of defendant's hair; witnesses who saw defendant in the vicinity of the decedent's house on the night of the crime; and a witness who had seen defendant earlier with a red pocket comb.

■ Defendant contends that the fingerprint on the bandaid can is not substantial evidence as the can was traced to a shipment which had been sold at the local drugstore. He argues that he could have placed his fingerprints on the can while it was on the shelf in the store sometime prior to the crime. The jury was presented with conflicting testimony as to how long a latent print would last on the surface of the can and still be clear enough to be processed by the dusting powder method. The estimates of time ranged from two weeks to an "indefinite" period of time. As we pointed out above, it is the duty of the jury to assign the probative value to each piece of evidence. If two differing inferences can be drawn from the evidence presented, the reviewing court will not alter the jury's decision as long as there is substantial evidence of probative value which satisfies the jury beyond a reasonable doubt. *Calvert v. State*, (1968) 251 Ind. 119, 239 N.E.2d 697.

■■ In each case, we must look to the whole body of the evidence to see if the verdict should be sustained. While differing inferences could be drawn from each piece of evidence here, *i.e.*, the fingerprint, the hair, the comb, and the presence of the defendant near the victim's home at the time of the crime, the evidence taken as a whole did corroborate the state's case and was sufficient to sustain the finding of the

jury that defendant was present in the decedent's home at the time of the crime.

■ Defendant was first convicted of voluntary manslaughter. The elements of this crime which the state must prove are that defendant knowingly or intentionally killed another human being. Here there was undisputed evidence that the decedent died from a severe blow to the back of the head. There was also evidence of a blow to the front of the head with a blunt instrument and another blow to the face with a fist. The decedent was an elderly woman while defendant was a healthy 27 year old male who was a former high school football player.

■ It is well settled that state of mind may be established by the circumstances surrounding the killing. *Anthony v. State*, (1980) Ind., 409 N.E.2d 632; *Blood v. State*, (1980) Ind., 398 N.E.2d 671. The intent to kill may be inferred from the deliberate use of a deadly weapon in a manner likely to cause death or great bodily harm. *Petro v. State*, (1978) Ind., 383 N.E.2d 323. Any object heavy enough to cause a fatal blow may be a deadly weapon, since the test is the manner in which the object is used during the crime. *Cummings v. State*, (1979) Ind., 384 N.E.2d 605; *Jones v. State*, (1978) 269 Ind. 543, 381 N.E.2d 1064. In the instant case, it was the prerogative of the jury to weigh all the circumstances surrounding the crime, including the severity and manner in which the blows were inflicted and the fact that both fists and a blunt object had been used. We find there was sufficient evidence here from which the jury could infer a knowing or intentional killing.

■ We also find there was sufficient evidence to support the jury's verdict on the burglary count as the evidence was undisputed that the back door frame had been forced and the decedent's car keys and billfold were later found under the snow in nearby yards. As we discussed above, the presence of defendant in the victim's home was sufficiently established.

Defendant finally contends that there was insufficient evidence to support the guilty verdict on the criminal deviate conduct count. This crime is defined in Ind. Code § 35–42–4–2 (Burns 1979 Repl.) which reads in pertinent part:

"(b) A person who knowingly or intentionally causes penetration, by an object or any other means, of the sex organ or anus of another person when:

(1) The other person is compelled by force or imminent threat of force;

(2) The other person is unaware that the conduct is occurring; or

(3) The other person is so mentally disabled or deficient that consent to the conduct cannot be given;

commits criminal deviate conduct, a class B felony. However, the offense is a class A felony if it is committed by using or threatening the use of deadly force, or while armed with a deadly weapon."

Thus the elements which the state must prove are: penetration of the sex organ or anus of another person; knowingly or intentionally; while using or threatening the use of deadly force.

Dr. Venables testified that during the autopsy he found a tear on the left side of the victim's labia majora. He further stated that the direction of the force that would produce such a tear was parallel to the leg and inwards. He testified that the labia majora is a part of the female sex organ and showed the jury a diagram which illustrated the exact position of the tear. However, the doctor did not form an opinion as to whether there was penetration of the sex organ. He found no evidence of spermatoza and no evidence of injury inside the vagina.

 It is well settled that our standard in cases of rape is that proof of the slightest degree of penetration is sufficient. *Allbritten v. State*, (1974) 262 Ind. 452, 317 N.E.2d 854; *Garr v. State*, (1974) 262 Ind. 134, 312 N.E.2d 70; *Mooney v. State*, (1965) 246 Ind. 570, 207 N.E.2d 623. The factfinder may infer penetration from circumstantial evidence such as the physical condition of the victim soon after the incident.

*Allbritten v. State, supra; Weaver v. State,* (1963) 243 Ind. 560, 187 N.E.2d 485. Since the labia majora is defined as part of the female sex organ, the evidence of the tear in this case is sufficient to support the finding of at least a slight penetration.

Other circumstantial evidence further supports the jury's finding on this count. When the victim's body was discovered, the clothes had been removed from the lower half of her body. Her slacks, panties, and hose were piled on top of her stomach. The evidence of blows to her head and face was clear and there was an overturned footstool near the body with blood on it. These circumstances support the knowing or intentional element and the use of deadly force.

Defendant finally argues that the state did not prove that the victim was actually alive when the penetration occurred and therefore was not a "person" within the meaning of the statute. In our code a "person" is "a human being, corporation, partnership, unincorporated association, or governmental entity." Ind.Code § 35–41–1–2 (Burns 1979). A human being means "an individual who has been born and is alive." *Id.*

Here, Dr. Venables testified that the tear was suffered at or about the same time as the head injuries. He stated that he did not think the victim's death was instantaneous and estimated that she lived thirty minutes to an hour after receiving the fatal blow. However, he also stated that it was difficult to distinguish ante-mortem from post-mortem wounds but that he believed the tear was not a post-mortem wound. Under the circumstances of this case, we find this was sufficient to support the jury's finding that the victim was a "person" within the meaning of the statute when the penetration occurred. We find there was substantial evidence of probative value to support the jury's finding on each element of the charged offenses.

## II.

Defendant next contends that certain evidence was improperly admitted because the

chain of custody was not sufficiently established. After the initial investigation of the decedent's home on the evening of January 7, 1979, the police left the back door locked and the back door area lit. Police patrols in the area were increased. The coroner picked up the red comb that night and gave it to Dr. Venables the next day at the autopsy. The bandaid can, the footstool, and other items were picked up by police investigators the next day, January 8, 1979, and the bandaid can was placed in an evidence bag at that time. The hair was not discovered by investigators until the afternoon of the following day, January 9, 1979.

Defendant contends that even though the back door of the house was locked it could still easily be forced open because of the bent frame. Therefore, he contends that the house was not left totally secure and the bandaid can could have been tampered with. Furthermore, he argues that since the hair was not discovered for two days, it could have been left on the door frame at some time after the crime. We do not feel these circumstances show an insufficient chain of custody.

■ It is well settled that the purpose of establishing a chain of custody concerning seized evidence is to show a complete chain of possession from the original receiver to the final custodian and thus lay a proper foundation connecting the evidence in question with the accused. *Williams v. State*, (1979) Ind., 387 N.E.2d 1317; *Bruce v. State*, (1978) 268 Ind. 180, 375 N.E.2d 1042; *Mendez v. State*, (1977) 267 Ind. 309, 370 N.E.2d 323. While a complete chain of custody must be established, the state is not required to exclude every remote possibility of tampering. *Williams v. State, supra; Kolb v. State*, (1972) 258 Ind. 469, 282 N.E.2d 541.

■ In the instant case, the victim's nephew testified as to the location of the bandaid can on the dresser top when he first discovered his aunt's body. The police investigator picked up the can from the dresser top and placed it in an evidence bag. Although the house was not left completely secure, there was no evidence that anybody tried to enter the house on January 7 or 8, 1979, without authority. There were nighttime illumination, increased police patrols, and bad weather on those nights. The items introduced at trial were described and identified by various witnesses and no material changes were shown. There was no dispute that the chain of custody was complete after the police investigators picked up the items. The jury was fully aware of the circumstances during the time in which the items were left in the victim's home. We have clearly held that the jury is competent to assess the circumstances and weigh the possibility of some tampering with items of evidence. It is up to the jury to decide what effect or weight to give each item of evidence. *Bruce v. State, supra.* We find there was a complete chain of custody established for the bandaid can and the hair and there was no error in their admission.

■ The victim's body was taken to the funeral home on the night of January 7, 1979, and was kept in an unlocked preparation room that night. No photographs of the body were taken until the next morning during the autopsy. Defendant contends that these conditions do not establish a chain of custody for the body sufficient to support the autopsy report of Dr. Venables, since the autopsy was performed the next day, January 8, 1979. We see no merit to this contention. As we pointed out above, the state is not required to exclude every remote possibility of tampering. Here, there was sufficient evidence introduced to establish the location of the body at all times and eliminate all but the most remote possibility of any unauthorized tampering with it. This was sufficient and there was no error here. *Mendez v. State, supra.*

■ The red comb was picked up by the coroner on the night the body was discovered and given to Dr. Venables at the autopsy. The doctor put it in an autopsy bag and then put it in an unlocked drawer in his desk apparently thinking it was unimportant. The police took possession of the comb on January 12, 1979. Defendant con-

tends that this is not a sufficient chain of custody to establish a foundation for the admission of the comb into evidence. However, there was no evidence that this item could be altered in any way which would affect its evidentiary value. No witness was ever able to testify that this specific comb was defendant's comb. As we have stated above, the jury is competent to assess the weight and effect of each piece of evidence and the state is not required to exclude every remote possibility of tampering. There was a sufficient foundation for the admission of the comb.

### III.

Defendant was arrested in Texas around noon on February 20, 1979. He was taken before a local magistrate on preliminary extradition matters and it was determined that he was on probation for another offense in Spencer County, Indiana. He was then placed in a local jail. Later in the day, at approximately 3:30 p. m., defendant was taken to an interrogation room where he was questioned by two Indiana police officers, Detectives Parker and Uhde. Texas Ranger Haskell Taylor was also present during the questioning. Taylor testified that defendant was advised of his rights and signed a waiver of rights form. He further testified that the questioning was friendly and relaxed. He said the Indiana police talked with defendant about what was going on back in Indiana. They asked him if he had ever been in Miss Ayer's home and if he had been drinking much lately. Defendant said he had not been in Miss Ayer's house since 1970 and had not had anything to drink since Thanksgiving, 1978. After these questions and answers, Taylor testified that defendant then said he did not want to say anything else. The questioning was immediately stopped at that point and Taylor estimated the total questioning period had lasted about twenty minutes. The Indiana police officer, Parker, gave essentially the same testimony about this questioning period.

Defendant now contends that it was error to allow the two police officers to testify, over his objection, about his statement that he didn't want to say anything else. Citing *Doyle v. Ohio*, (1976) 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, and *Jones v. State*, (1976) 265 Ind. 447, 355 N.E.2d 402, he contends that he was denied due process in that the prosecutor impermissibly used his post-arrest silence and prejudicially penalized him for exercising his constitutional right to remain silent.

We find that there was no violation of defendant's rights under the circumstances of this case. Defendant did not remain absolutely silent after his arrest. His statement that he had not been in Miss Ayer's house since 1970 was consistent with his alibi defense asserted at trial. His statement that he didn't want to say anything more was relevant to show why the questioning period was suddenly terminated. There is nothing in the record to suggest that defendant's failure to relate more information about his potential alibi at that time was an exercise of his Fifth Amendment rights. Defendant voluntarily chose to give the police certain, selected answers rather than clearly relying on his Fifth Amendment rights and we have previously found no constitutional violation under these circumstances. *Nelson v. State*, (1980) Ind., 401 N.E.2d 666; *Jacks v. State*, (1979) Ind., 394 N.E.2d 166.

### IV.

Defendant next contends that his post-arrest statements should have been excluded as they were the product of an unlawful arrest. An arrest warrant can issue only upon a showing of probable cause sufficient to satisfy the demands of both the federal and state Constitutions. It is well settled that the allegation of the crime must be supported by enough underlying facts and circumstances to allow a neutral judicial officer to make an independent determination as to probable cause. *Kinnaird v. State*, (1968) 251 Ind. 506, 242 N.E.2d 500; Fourth Amendment, United States Constitution; Article 1, § 11 of the Indiana Constitution.

In this case, there was a probable cause hearing based upon the police officer's affidavit that the fingerprint on the bandaid can had been identified as matching defendant's known fingerprints. The affidavit also contained a description of what the pathologist had found in his examination of the body, a description of what the victim's nephew had found when he first discovered the body, and a description of what the police investigators had found. Although it is true that only the one fingerprint actually linked defendant to the scene of the crime at this point, it was an unequivocal identification. We find that the fingerprint identification together with the other circumstances of the crime as related to the court did support the finding of probable cause for defendant's arrest.

### V.

Defendant next contends that it was error to admit certain opinion testimony from one witness. The witness, Michael Oliver, was the microanalyst who had examined the hair strand found on the back door frame of the victim's house. He testified that the hair had certain characteristics such as oval shape, courseness, pigmentation, and twist from which he could determine the racial origin of the person from whom it came, and that defendant's known hair samples also matched these characteristics. He stated that he had determined that there were sufficient similarities between the hair strand and the known samples for them to be of common origin. He was also allowed to testify, over a timely objection, that it was his "opinion that the sample found in the door probably came from the known sample" of the defendant.

Defendant contends that there was no scientific basis upon which Oliver could base his opinion and therefore his opinion was devoid of probative value. We do not agree. There is no dispute of the fact that Oliver was a qualified microanalyst with specialized training and experience in the examination and comparison of hair and fibers. The jury was informed of the limits of the hair matching tests. Oli-

ver's opinion was based upon a number of matching characteristics which he illustrated for the jury. The determination of whether a witness is qualified to give an opinion is within the trial court's discretion. The extent of the witness's knowledge affects the weight of his testimony and not its admissibility. *Reid v. State*, (1978) 267 Ind. 555, 372 N.E.2d 1149; *Niehaus v. State*, (1977) 265 Ind. 655, 359 N.E.2d 513. The alleged lack of reliability can be brought out on cross-examination, and as long as the expert is otherwise qualified, goes to the weight of the evidence and not to its competency. *Smith v. State*, (1972) 259 Ind. 187, 285 N.E.2d 275. We find no error in the admission of this testimony.

### VI.

Defendant next contends that four photographs of the victim's body taken during the autopsy were erroneously admitted as they were inaccurate and unduly gruesome. These four black and white photographs show the victim's head, face, skull, and lower torso. Defendant argues that the photographs are inaccurate because of their poor quality and because the embalming process had slightly altered the appearance of the skin. He also argues that the pictures are unduly gruesome and inflammatory.

The record shows that Dr. Venables identified the photographs and testified that they accurately depicted the victim's wounds. He pointed out that one negative had been twisted and the print was therefore reversed. The jury was also told that the limited shading range of the black and white pictures caused a slight darkening of the bruises. Since the limits of the photographic process were clearly explained, the jury was competent to assess the effect of those limitations on the accuracy of the photographs. It is well settled that trial courts have wide discretion in determining the admissibility of photographic evidence. The test to be applied is whether or not the photographs are relevant to any material issue in the case determined by inquiry as to whether a witness would be permitted to describe verbally the

subject of the photographs. *Gee v. State*, (1979) Ind., 389 N.E.2d 303; *Rogers v. State*, (1979) Ind., 383 N.E.2d 1035; *Brandon v. State*, (1978) 268 Ind. 150, 374 N.E.2d 504. In the instant case, the photographs were relevant to show the nature of the victim's wounds and were not unduly prejudicial. There was no abuse of discretion here.

## VII.

Defendant next contends that the trial court erred in ruling that a defense witness could not testify because of a violation of a separation of witnesses order. The witness, Jeff Lindsey, was a law clerk and investigator for defense counsel. Lindsey was present in the courtroom during the testimony of a police officer, James Ambroise, in violation of the court's separation of witnesses order. The only exception to this order was defendant's mother. Defendant wanted Lindsey to testify to contradict Officer Ambroise's testimony that he had never made any comments about defendant being "framed."

 It is clear that the separation of witnesses and the course to be followed when a separation order is violated are within the discretion of the trial court. *Rinard v. State*, (1976) 265 Ind. 56, 351 N.E.2d 20; *Dudley v. State*, (1970) 255 Ind. 176, 263 N.E.2d 161. In this case, defendant had ample opportunity to cross-examine Officer Ambroise. Defendant had not asked to have Lindsey exempted from the separation order. We find no abuse of discretion here.

## VIII.

Defendant next contends that it was error for the trial court to allow the prosecutor to use a prior burglary conviction for impeachment purposes. Defendant was on probation following that conviction at the time of the instant trial. However, this prior conviction was based upon a guilty plea and an appeal of the conviction had been filed. The appeal was subsequently granted on June 17, 1980, about one year after the instant trial which was in August of 1979. The guilty plea was held to be invalid.

 It is well settled that a defendant's credibility may be attacked by showing that he has a prior criminal conviction for a crime involving dishonesty or false statement or for a crime which would have rendered a witness incompetent. *Ashton v. Anderson*, (1972) 258 Ind. 51, 279 N.E.2d 210. There is no claim here that the evidence of the prior conviction was used in any way other than impeachment. We do not agree with defendant's argument that the conviction should not be used until the appellate process is exhausted. As our Court of Appeals has stated:

"The majority rule allows the credibility of a witness to be attacked by showing a previous criminal conviction even though an appeal therefrom is pending. *See* 16 A.L.R.3d 726. The cases are bottomed on one or both of the following premises:

"1. A conviction extinguishes the presumption of innocence.

"2. The judgment holds fast as a final determination until such time as it may be reversed."

*Snelling v. State*, (1975) 167 Ind.App. 70, 74–75, 337 N.E.2d 829, 832.

The law in Indiana is that prior convictions are not rendered inadmissible because of the pendency of an appeal. There was no error here.

## IX.

 Defendant's proposed final instruction No. 2 gave the following definition of the word "person."

"Under the Indiana Penal Code a 'person' is defined as a human being who was born and who was alive at the time of the alleged offense. Therefore, if you have a reasonable doubt as to whether Evelyn Ayer was alive at the time of the conduct alleged in Count II of the information, that being the charge of criminal deviate conduct, you must find the defendant not guilty of that offense."

The trial court refused this instruction. Defendant argues that there was no proof that the victim was alive at the time of the

alleged penetration; therefore, there was no proof that she was a "person" within the meaning of the statute and that the jury should have been instructed on this point.

We find that defendant's instruction was incomplete and would have been misleading to the jury since it did not cover the situation where an individual is unconscious but still alive. In the instant case, Dr. Venables testified that the victim might have been unconscious at the time of the alleged deviate conduct. There is no error in refusing incorrect or misleading instructions. *Johnson v. State*, (1979) Ind., 387 N.E.2d 1328; *Toliver v. State*, (1978) 267 Ind. 575, 372 N.E.2d 452.

### X.

Defendant argues that the court's final instructions on reasonable doubt are erroneous because they used the word "should" in relation to the jury's duty upon finding reasonable doubt rather than the word "must." However, the record shows that the jury was instructed as to the seriousness of their duty and the requirement that the state must prove each element of the offenses charged beyond a reasonable doubt. They were instructed that if they entertained a reasonable doubt they *must* acquit defendant. It is well settled that instructions are to be considered as a whole. *Porter v. State*, (1979) Ind., 391 N.E.2d 801; *Tinsley v. State*, (1977) 265 Ind. 642, 358 N.E.2d 743. We considered a similar question concerning an instruction in *Fisher v. State*, (1973) 259 Ind. 633, 291 N.E.2d 76. We find no reason to change our holding in that case wherein we said:

> "A trial court need not be restricted to the use of certain sacred phrases as long as the instruction clearly states the correct legal principle." *Id.*, 259 Ind. at 646, 291 N.E.2d at 83.

### XI.

Defendant also alleges that the court's final instruction No. 57 was erroneous because it placed an undue emphasis on the jury's duty to convict and not enough emphasis on the jury's constitutional right to determine the facts and the law for themselves. The instruction read as follows:

> "I submit this case to you with the confidence that you will faithfully discharge the grave duty resting upon you bearing in mind that the liberty of the accused is not to be trifled away nor taken by careless or inconsiderate judgment; but if after a careful consideration of the law and the evidence in the case you are satisfied beyond a reasonable doubt that the defendant, Tyreese Rowan, is guilty, you should return your verdict accordingly. Duty demands it and the law requires it. You must be just to the defendant and equally just to the State. As upright men and women charged with the responsible duty of assisting the Court in the administration of justice, you will put aside all sympathy and sentiment and look steadfastly and alone to the law and the evidence in the case and return into Court such a verdict as is warranted thereby."

We have approved this instruction in other cases and find that it adequately requires the jury to be fair to both the state and the defendant and to render a verdict in accord with the evidence and the law. *Certain v. State*, (1973) 261 Ind. 101, 300 N.E.2d 345.

### XII.

Defendant next attacks the constitutionality of our death penalty procedure. In this case, defendant was originally charged with murder and the prosecutor also filed a death penalty charge. Since the jury returned the verdict of voluntary manslaughter, the death penalty charge was not presented to them. Defendant now alleges that our death penalty procedure of allowing the state to file a death penalty charge without a neutral pretrial review gives a prosecutor unfettered discretion to charge persons with capital crimes and denied defendant his due process and equal protection rights.

We recently considered these arguments in depth in a case in which a death penalty verdict was returned. We stated there:

"We find no constitutional problems in this area. Prosecutors are traditionally given a wide discretionary power in our criminal justice system to select the persons who are to be prosecuted at any level and to plea bargain with them.... Our statute has numerous provisions that protect each individual defendant from *receiving* an arbitrary or capricious sentence of death. The constitutional rights of our citizens are thus adequately protected." *Williams v. State*, (1982) Ind., 430 N.E.2d 759.

We find no error here.

### XIII.

▆▆▆ Defendant next contends that he did not receive a fair trial since persons who opposed capital punishment were challenged during the jury selection and removed. He argues that since the county in which the trial was held has a relatively small population, a sizeable proportion of the community representative of a particular point of view was excluded from the jury. He also argues that a death-qualified jury is *per se* unrepresentative and more likely to find guilt.

Defendant cites no persuasive authority for his position. However, we do not need to reach any discussion of the merits of this issue, since defendant was not convicted of murder and the question of the death penalty was never presented to the jury. *Lamar v. State*, (1977) 266 Ind. 689, 366 N.E.2d 652.

### XIV.

▆▆▆ Defendant next contends that the jury's verdict on the criminal deviate conduct count was not specific enough to support the crime as a class A felony, since the jury made no specific finding of the use or threat of deadly force. The jury's verdict read as follows:

"We, the Jury, find the Defendant, Tyreese LaVal Rowan, guilty of the crime of criminal deviate conduct as charged in Count 2 of the information."

It is well settled that a jury in a criminal proceeding may return a general verdict of "guilty as charged," and there is no require-ment that the verdict must recite the entire charge. A verdict will not be considered defective unless it is so uncertain that no judgment can be rendered thereon. *Grimm v. State*, (1980) Ind., 401 N.E.2d 686; *DeVaney v. State*, (1972) 259 Ind. 483, 288 N.E.2d 732; *Johnson v. State*, (1969) 252 Ind. 70, 247 N.E.2d 212. Here the jury was properly instructed on all the elements of the crimes charged and the term "deadly force" was defined. Instructions and verdict forms for lesser included offenses were given to the jury. We find the verdict was consistent with the crime charged and there was no error here.

### XV.

Defendant finally argues that he was denied a fair trial because of the investigative "blunders" of the police. He points to specific investigative omissions such as the failure to completely process the victim's home for fingerprints, the failure to preserve adequate photographs of the scene and the victim's body, the failure of the pathologist to include the taking of microscopic sections in the autopsy, and the failure of the police to make any serious attempt to find and talk to the persons who were with defendant on the night of the crime.

▆▆▆ It is clear that the negligent destruction or withholding of material evidence by the police or the prosecution may present grounds for reversal. *Birkla v. State*, (1975) 263 Ind. 37, 323 N.E.2d 645; *Hale v. State*, (1967) 248 Ind. 630, 230 N.E.2d 432. A suppression by the prosecution of evidence favorable to an accused violates due process when the evidence is material either to guilt or punishment. *United States v. Agurs*, (1976) 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342; *Brady v. Maryland*, (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

▆▆▆ In the instant case, defendant is not able to point to any specific evidence which actually was destroyed or lost. He is not able to establish that any other relevant evidence exists. His speculations about what might have existed do not offset the

deference which must be given to the expertise of police officers in conducting an investigation. Defendant has not shown how he was prejudiced by the manner of the police investigation. *Turpin v. State,* (1980) Ind., 400 N.E.2d 1119. There was no error here.

For all of the foregoing reasons, there was no trial court error and the judgment of the trial court should be affirmed.

Judgment affirmed.

GIVAN, C. J., and DeBRULER, PRENTICE and PIVARNIK, JJ., concur.