Leo Vernon **BALDRIDGE** and Murray Baugh, Appellants,

v.

The **STATE** of Texas, Appellee.

No. 51922.

Court of Criminal Appeals of Texas.

Dec. 1, 1976.

Robert J. Newton, Freeport, for appellants.

Ogden Bass, Dist. Atty. and Thomas W. Watson, Asst. Dist. Atty., Angleton, Jim D. Vollers, State's Atty. and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

BROWN, Commissioner.

This is an appeal from convictions for murder with malice under the former penal code. Appellants were jointly tried before a jury which assessed punishment for each man at life in the Texas Department of Corrections.

The record reflects that the killing took place at the home of Mrs. Vallie Baugh, the ninety-two year old mother of appellant Baugh, and grandmother of appellant Baldridge. It seems that a disagreement had arisen over the exact location of the property line between Mrs. Baugh's property and the adjoining homesite of Mrs. Helen Williams Cassel. The properties are located in a rural area of Brazoria County near the community of Old Ocean.

On the day preceding the killing there was a discussion about the property line involving Mrs. Pearl Baldridge who is Baugh's sister and Baldridge's mother; Mrs. Cassel; a Mr. Harris, who was the vendor of the land to Mrs. Cassel, and Deputy Sheriff Clarence Edwards. The record is not clear about whether any agreement was reached at this meeting, but it does appear that a new survey of the property was conducted at the direction of Harris

and stakes were driven into the ground to indicate the surveyor's findings. Neither appellant was involved in these discussions.

Appellant Baugh testified that on the day of the killing he arrived at his mother's home at approximately 5:30 p. m. He stated that she was upset over the property dispute and that he agreed to put up a fence along the property line. He began digging postholes along an older fence line which he said had been on the property years before.

Mrs. Cassel testified that she observed appellant digging the postholes. She stated that she called the Sheriff's Department and that Deputy Sheriff James Douglas was sent to her home. She stated that she told Douglas what had transpired on the previous day and that appellant was not supposed to be digging the holes. She further said that Douglas left her door and approached appellant and that she followed to see what would be done.

It appears from the testimony of several witnesses that a conversation ensued between Douglas and appellant Baugh. In the yard of the Baugh home were Mrs. Pearl Baldridge, appellant Baldridge, Baugh's brother Tom, his sister Mrs. Majorene Waddy, and several other neighbors and children. In the Cassel yard were Mrs. Cassel, her sister, and a niece. The conversation between Douglas and Baugh was brief. Douglas apparently asked Baugh to refrain from digging the holes and Baugh replied that the property was his mother's and that she had lived there thirty-three years and that she had a right to have it fenced. Baugh told the deputy he would rather "die and go to hell" than give up the land and Douglas is said to have replied that there would be no killing, that he was there "to settle this thing."

Although all of the witnesses testified that the conversation was not "heated" and that appellant was very calm, it seems that when appellant continued digging the holes, the deputy attempted to physically restrain him. All of the witnesses except a neighbor, Mrs. Albertha Lee, testified that Doug-

las struck appellant first with what was described as a blackjack or billy club. The club was knocked from the deputy's hand and appellant grabbed him in what he stated was an attempt to keep the deputy from getting to his gun. Douglas drew his .357 Magnum service revolver and began firing. The evidence is somewhat conflicting but it appears that appellant and the deputy were still engaged in combat when the gun was drawn and all six rounds were fired at close range toward the ground as though the deputy's arms were pinned to his side by appellant. Two of the bullets struck appellant in the leg and foot and he retreated. It was during this shooting that appellant Baldridge drew a .25 caliber automatic from his jacket and fired at Douglas, hitting him in the hand with three shots and in the chest with the fourth. A fifth shot missed.

The deputy then ran or staggered back toward his patrol car and collapsed in the road. An ambulance and more police officers were summoned. Douglas died shortly thereafter at a nearby hospital. Appellant Baugh was arrested, treated for his wounds and taken to the police station where he gave a statement. Baldridge was also arrested and taken to the station where he also gave a statement.

Frances Griffin, Mrs. Cassel's niece, gave testimony which was only slightly contradictory. She was unable to state who struck the first blow, but her testimony seems to indicate that she thought appellant Baugh may have been the aggressor. Albertha Lee gave testimony which was contradictory to the extent that she said appellant Baugh dropped the posthole digger and that during the conversation with Douglas he grabbed the deputy's collar and that it was then that Douglas pulled the blackjack or billy club and swung at appellant. However, Mrs. Lee also stated that when the deputy first approached the property appellant Baugh dropped the posthole digger and walked toward him and that appellant Baldridge then took up the digging. Although Baldridge's statement gives a similar rendition of the sequence of events, none of the other witnesses testified

that the events occurred in that sequence. All of the other testimony was to the effect that Baldridge was merely standing nearby, and that the scuffle between the deputy and Baugh took place near the postholes.

It should be noted that none of the witnesses could state that Baldridge was involved in the discussion in any way. They stated that Baugh and Baldridge did not speak to one another at any time before or after the incident. There was also some rather confusing testimony about a clipboard which the deputy was carrying at the time. It seems that the clipboard was dropped during the scuffle and that one of the eleven bullets fired from the two guns pierced the clipboard. The State introduced the testimony of a firearms expert who stated that the hole in the clipboard was made while it was held in the air, although all of the witnesses testified that the clipboard was knocked down or dropped before the shooting started. We note also that the blackjack or billy club was not recovered.

Appellant presents thirty grounds of error in this appeal on behalf of both Baugh and Baldridge. We have reviewed all of the grounds of error and the entire record and have determined that the judgment must be reversed. In light of our disposition of this appeal we will discuss only the two issues below.

In ground of error seven appellant contends that the trial court erred in failing to charge the jury on the "presumption of the use of the weapon of the deceased" and in his twentieth ground of error appellant complains of the court's failure to charge on the law of homicide to prevent murder, maiming, disfiguring or castration. Appellant timely filed special requested charges which were denied and submitted written objections to the court's charge which were overruled.

Appellant relies on Article 1223, Vernon's Ann.P.C., in effect at the time of this offense, which provides as follows:

"When the homicide takes place to prevent murder, maiming, disfiguring or castration, if the weapon or means used by

the party attempting or committing such murder, maiming, disfiguring or castration are such as would have been calculated to produce that result, it is to be presumed that the person so using them designed to inflict the injury."

The court charged the jury on the law of justifiable homicide to protect another person from unlawful violence and applied the law to the facts of the case. The jury was instructed to find appellant Baldridge not guilty if they believed that he shot and killed the deceased because it reasonably appeared to him that the deceased was making an unlawful attack upon appellant Baugh or that Baugh was in danger of death or serious bodily injury at the hands of the deceased.

■ We recently held that before the presumption of Article 1223, supra, comes into play there must be a showing (1) that the deceased had a weapon, (2) that such weapon in the manner of its use was calculated to cause death, and (3) that the deceased was using the weapon to make an assault upon the accused at the time the accused killed the deceased. *Emanus v. State,* 526 S.W.2d 806 (Tex.Cr.App.1976); *Stone v. State,* 510 S.W.2d 612 (Tex.Cr.App. 1975); *Sistrunk v. State,* 486 S.W.2d 304 (Tex.Cr.App.1972). It is clear from the evidence as briefly set out above that Article 1223 is applicable to the instant case.

The case of *Valdez v. State,* 385 S.W.2d 239 (Tex.Cr.App.1964) is controlling in this situation. In *Valdez,* the accused shot and killed the deceased, who had a knife which he was using to slash and stab the brother of the accused. The trial court instructed the jury upon the right of the accused to defend his brother against an unlawful attack being made by the deceased from which attack it appeared to the accused that his brother was in danger of death or serious bodily injury at the hands of the deceased. We held that the failure of the trial court to grant the requested special instruction on the statutory presumption arising under Article 1223 was reversible error.

On remand Valadez was convicted a second time and he again appealed to this Court. He again asserted the failure of the trial court to include the charge on Article 1223. However, in the second trial the court included in the charge the definition of a deadly weapon and instructed the jury that if the deceased was using a deadly weapon in attacking defendant's brother, then the law presumed that the deceased intended to murder him. The court further charged that if it reasonably appeared to the defendant, viewed from his standpoint alone, that his brother was in danger of death or serious bodily injury at the hands of the deceased, then he would be justified in killing the deceased. The charge was substantially the same as Article 1223, and we held that there was no error. *Valadez v. State,* 408 S.W.2d 109 (Tex.Cr.App.1966). Compare *Emanus v. State,* supra.

■ In the instant case the deceased deputy had a deadly weapon which he was using to make an assault upon the person of appellant Baugh. The court included a charge of justifiable homicide to protect another from unlawful violence, as the court in the first *Valadez* case did. However, the court failed to charge on the statutory presumption under Article 1223. Both appellants were entitled to have the presumption included in the charge. The failure to so charge calls for reversal of the conviction. *Valadez v. State,* 408 S.W.2d 109, supra.

■ In his sixth ground of error appellant contends that the evidence is insufficient to support a verdict of guilty as to appellant Baugh. We have reviewed the entire record in the light most favorable to the verdict and we agree with appellant.

There is no doubt that it was appellant Baldridge who fired the shots which killed the deputy. The only possibility of establishing Baugh's guilt is as a principal.

The case is similar to *Morales v. State,* 466 S.W.2d 293 (Tex.Cr.App.1971), relied on by appellant. In that case the three defendants engaged in harassment of the deceased, a stranger to them, because "he had too many girls." The three then began scuffling with the deceased and during the scuffle one of the defendants drew a knife

and stabbed the deceased. All three were convicted of murder. On appellant's motion for rehearing we reversed the conviction of Juan Morales because "there was no showing in the record that Juan knew that (his brother) was armed or that he agreed with him to do anymore than harass a boy who had more girls than they did." See also *Montalbo v. State,* 145 Tex.Cr.R. 140, 166 S.W.2d 694 (1942).

■ Knowledge of the intent to kill the deputy is a necessary element to constitute Baugh as a principal in this murder with malice. *Morales v. State,* supra. Of course, this knowledge may be inferred from the *circumstances surrounding the killing.* However, all circumstances militate against an inference that Baugh knew of Baldridge's intent to kill the deputy. There is no evidence that Baugh knew that Baldridge had a gun in his possession. It would appear from all the evidence that any intent that Baldridge may have had to kill the deceased arose during the brief fight and that Baldridge in no way communicated his intentions to Baugh.

■ The record is silent as to any common purpose or design. In situations in which one may be guilty as a principal, the very least that is required in addition to physical presence is encouragement by words or agreement to the commission of the offense. Such agreement must be prior to or contemporaneous with the criminal event. *Suff v. State,* 531 S.W.2d 814 (Tex. Cr.App.1976); *Middleton v. State,* 86 Tex. Cr.R. 307, 217 S.W. 1046 (Tex.Cr.App.1919). All of the evidence indicates that there was no conversation between Baugh and Baldridge and that Baldridge's actions were a spontaneous result of the scuffle between Baugh and the deputy.

We find the evidence insufficient as to appellant Baugh to support a conviction for murder with malice.

The judgments are reversed and the cause remanded.

Opinion approved by the Court.

DOUGLAS, Judge (concurring in part and dissenting in part).

The judgments are reversed because no instruction was given on the presumption of the use of the gun by the deceased. There was evidence by the defense that the deceased committed an unprovoked attack on Baugh with a gun. Had we been jurors, we might not have believed this testimony, but that was a matter for the jury to decide with the aid of a proper instruction.

However, the judgment against Baugh should not be reversed on the ground of sufficiency of the evidence. The Court should consider all of the facts and circumstances to determine if the evidence is sufficient to show the two acted as principals.

Baugh was Baldridge's uncle. The Baugh family was upset about a survey which showed a small strip of land was determined to be that of Helen Cassel. Baugh was digging post holes on a line claimed by the Baughs when Officer Douglas arrived.

Albertha Lee, who was related to the Baughs, testified that at about 6:40 p.m. on May 15, 1973, she was at Helen Cassel's house when Officer Douglas drove up. Murray Baugh was digging post holes. Leo Vernon (Jim) Baldridge and his mother had arrived some five minutes earlier and she drove an iron "stob" in the driveway. Douglas talked to Mrs. Cassel who had called the sheriff's office. He then asked Murray to drop the post hole digger. Murray dropped the digger and said the land had been theirs for 33 years and he had rather die and go to hell than lose it. Baldridge started digging with the post hole digger and the officer told him to stop. Murray then grabbed the officer by the collar and Baldridge's mother then told Mrs. Cassel to stay out of it. Mrs. Cassel left. The officer pushed to keep Murray off of him and Murray grabbed the officer's blackjack. A clipboard that the officer was holding fell out of his hand. The officer grabbed his pistol and in no way was trying to shoot Murray. They were scuffling and Murray had the officer's arms pinned to his

body. The officer got his pistol "and he started trying to keep Murray back." Baldridge stayed within six feet there with his hand in his right pocket. Shots were fired and Pearl Baldridge saw the officer run toward his car. He fell down with his hand on his chest. She testified that Murray hit the first lick and the officer pulled his gun and was shooting into the ground to keep Murray off of him. Murray kept coming at him.

Cleveland Lee, 79 years of age, testified that he was at the Baugh house in Old Ocean on the day in question and saw Murray digging post holes. He gave a different version as to who struck the first blow. Pearl Baldridge, the sister of Murray and the mother of Leo Vernon Baldridge, was there.

Clarence E. Edwards, a deputy sheriff of Brazoria County, testified that on the day before the homicide he and Pearl Baldridge went to the sheriff's office and said that Selkirk Harris was trying to take of some of her mother's land. Sheriff Gladney sent Edwards to see if he could straighten it out. Deputy Edwards and Selkirk Harris went by and picked up Pearl Baldridge at her cafe, the Lincoln Drive Inn, and went to talk to Helen Cassel to find out what the facts were.

On the day of the homicide Helen Cassel called the sheriff's office because Murray Baugh was digging the post holes. The officer told Murray that he did not come out there to take sides.

Tom Baugh, a brother of Murray Baugh and Pearl Baldridge, was at the home at the time of the homicide. When Officer Douglas arrived, Tom told him that "nobody was violating the law and nobody called him there" and that he was disturbing the peace there, and "I told him he couldn't handle those boys, Murray killed a man." After an objection, the court instructed the jury not to consider the last statement. Later Tom Baugh, without objection, testified as follows:

"A I told him he couldn't handle those boys unless he called for help.

"Q Did you tell the officer if he fought Murray, Jim (Leo Vernon) would kill him?

"A I told him if he gets in it, Jim will kill him.

"Q And Jim did kill him?

"A Yes."

The record shows that Officer Douglas was shot four times with an automatic .25 caliber pistol. From the ejection pattern of the spent shells, Baldridge moved to several different spots to fire.

Pearl Baldridge testified that on May 11 (four days before the homicide) Selkirk Harris, who had sold the property adjoining her mother's and surveyed the property on the 14th of May, went with Deputy Edwards to Sheriff Gladney's office to tell him about Selkirk Harris' surveying the property because her mother was upset about the survey. They drove to her mother's place. Murray lived with their mother. Vernon took her to her mother's the day of the homicide. When they arrived, they saw the police car at Helen Cassel's. They walked over to Murray and asked what he was doing, and he said, " 'Digging holes' " and, "I didn't say any more." She did not talk to Murray because the officer could do better because they had an agreement the day before not to do anything about a fence until the matter was settled. Her testimony that she had not talked to Murray about not starting a fence was impeached when it was shown that she had previously said that she told him not to do anything about a fence until the boundary line could be established.

Pearl and Leo Vernon were in a hurry to get to the property the afternoon in question. Vernon got ahead of the others at the service station to buy $2.00 worth of gas and stated that he was in a hurry.

There were sufficient facts and circumstances for the jury to conclude that both appellants were acting together to do anything to prevent Officer Douglas from stopping the post hole digging, just as there were sufficient facts and circumstances for Tom Baugh to conclude that if a fight started the officer would be killed.

Where two are charged as acting together, the case assumes the nature, to some extent, as with a conspiracy. A conspiracy is an agreement manifesting itself in words or deeds by which two or more persons confederate to an unlawful act. See *Young v. State*, 150 Tex.Cr.R. 378, 201 S.W.2d 46 (1947).

With the reasoning adopted by the majority to the effect there is no evidence that Murray knew of the intention of Leo Vernon, the convictions for one driving the getaway car in a robbery case could not be affirmed absent proof that the driver knew of the intent to rob.

A conspiracy may be shown by circumstantial evidence. See *Morgan v. State*, 519 S.W.2d 449 (1975); *Kay v. State*, 489 S.W.2d 861 (Tex.Cr.App.1973), and *Mutscher v. State*, 514 S.W.2d 905 (Tex.Cr.App. 1974).

An agreement does not have to be made in words. A nod of the head or other gesture could be enough to manifest assent.

We should hold the evidence sufficient to support the conviction.