Jim GORDON, Appellant,

v.

The STATE of Texas, Appellee.

No. 04–81–00116–CR.

Court of Appeals of Texas, San Antonio.

Sept. 1, 1982.

Gerald L. Anderson, Lubbock, for appellant.

John T. Montford, Criminal Dist. Atty., Lubbock, for appellee.

Before ESQUIVEL, CANTU and BASKIN, JJ.

## OPINION

CANTU, Justice.

Appeal is taken from a conviction of murder. The punishment as assessed by the jury is 15 years' confinement in the Texas Department of Corrections. Appellant was indicted by a Lubbock County grand jury and the trial was transferred to Kerr County on the granting of appellant's motion for change of venue.

Review is sought on the following three grounds of error:

1. The trial court erred in admitting evidence obtained as the result of two invalid search warrants and two warrantless searches, which evidence was used to corroborate the testimony of accomplice witnesses.

2. The trial court erred in not granting appellant's requested charge on involuntary manslaughter.

3. The trial court erred in not instructing a verdict for appellant, because the evidence was insufficient to corroborate the accomplice testimony used to convict the appellant.

The conviction arises from a senseless and tragic series of events which began on December 24, 1977. The evidence developed during a lengthy trial and viewed in the light most favorable to the jury verdict reflects that in the late hours of Christmas Eve 1977, the body of William Drew Young, III, was discovered in the trunk of a burning car one mile from Farm to Market Road 1585 in Lubbock County. The deceased had been shot in the neck and had expired from the wound. An incredible sequence of investigative accomplishments led Lubbock city policemen, county sheriff's deputies and state officers to focus their attention on a drinking establishment in the City of Lubbock known as the Salt River Saloon.

Several weeks of further investigation resulted in the return of murder indictments against appellant and five others. Three of them, Jean Ann "Tico" Lowrance, her husband, Homer Lowrance and Janice La Dell Payne, testified against appellant pursuant to an agreement with the State, and the State's case rested substantially upon their testimony. The State also relied upon the testimony of fourteen law enforcement officers, chemists, physicians and assorted experts, each supplying incriminating circumstances in the reconstruction of a gigantic evidentiary jigsaw puzzle.

Kenneth Jaycon, Kenneth Herndon and appellant were separately tried. Appellant was convicted upon the theory of criminal responsibility for the conduct of another, as provided in Tex.Penal Code Ann. §§ 7.01 and 7.02 (Vernon 1974).

Sherry Lindell and Pam Eggers, non-accomplice witnesses for the State, did not witness the killing but were present and witnessed events leading up to the actual shooting. The testimony of these witnesses further reveals a series of brutal acts committed by appellant, Herndon and Jaycon, culminating in the attempted destruction of all evidence of the crime by the use of fire,

including the attempted burning of Young's chemically soaked body as it lay stuffed in the trunk of his own car.

In mid-November 1977, approximately a month before the incident giving rise to the prosecution, appellant entered into an agreement with Tico Lowrance to run the Salt River Saloon on a 60/40 percentage split. Homer Lowrance, Tico's husband, assisted her in the everyday operations and served as an occasional bartender. Payne worked for Tico at the club and had previously been employed by appellant at his club known as the "Saddle Bronc", also located in Lubbock. Young, the deceased, was hired sometime in November as a bartender by Tico to assist her at the Salt River Saloon and worked only a few weeks before absconding with the day's receipts on December 21, 1977. The incident was reported to the Lubbock police and a criminal complaint was filed with the District Attorney. Young was not seen again until the 24th of December.

Lindell and Eggers were both employees of Tico at the Salt River Saloon and had worked with Young either as bartenders, dancers, managers or waitresses. Both were present at the club on the day of the shooting.

On the evening of December 24, 1977, at approximately 5 p.m., Tico and Homer received a call at their home from the club's bartender. Due to the urgency of the call, Tico notified appellant that Young was at the club threatening to return with his "bandito" friends to rob the club and shoot anyone who attempted to stop him.

Sometime after Tico, Homer and Payne arrived at the club, appellant entered, accompanied by Jaycon and Herndon. Herndon had a gun between his belt and waist band.[1] Appellant joined Tico and Homer at a table for a drink. Jaycon and Herndon sat at a table across the room with Payne and commenced to drink excessively. About half an hour later Eggers arrived at the club and was surprised to see Tico and

Homer there, since she (Eggers) was supposed to work the late shift and close the place up at 2 a.m. She left the club on an errand for about thirty minutes, and when she returned she noticed Young sitting in his car parked in the driveway of the club. She walked into the club without acknowledging his presence, and went directly to the table occupied by Tico, Homer and appellant to advise that Young was outside the club. Tico went out and verified that Young was indeed there. Appellant motioned Jaycon and Herndon over to his table and instructed them to go and bring Young inside. Tico followed them outside and saw Jaycon and Herndon dragging Young by his arms around the back of the building. As she ran back inside the club she observed someone opening the emergency side door. Jaycon and Herndon walked in with Young who was still being restrained. Herndon was carrying a pistol in his other hand. Young was bleeding from the top of his head and appeared to be incoherent as he was taken toward appellant. Appellant immediately began swinging at Young with his fist and open hand, striking Young all about the head. As he repeatedly struck at Young, appellant, by now angry and frustrated, screamed out, "Why do you keep fucking with me? Don't you know who I am? What did you do with my goddamned money?" The screaming and beating continued for about ten minutes until Homer suggested that the problem be taken into the club office and away from public view. Jaycon and Herndon then dragged Young into the office and were followed by Tico, Homer, Payne and appellant. All the while, appellant continued to strike and scream at Young until Tico intervened long enough to talk to Young. Very shortly thereafter, appellant began ranting and raving again and commenced striking at Young again. Appellant again screamed, "You tell me where the hell my money is. Don't you know who I am? You can't be fooling—fucking around with me. If you

1. The gun was described by Homer as a single action .357 magnum western style pistol that will not fire unless the hammer is cocked back.

don't, I will take you out in the woods." Appellant then walked over to Herndon and said, "Give me that goddamned gun." Herndon then came up to appellant and suggested that appellant need not get involved and volunteered to do it for him. Herndon began to beat up on Young and, following a scuffle in which Young was struck over the head with the gun, Herndon said to Young, "I will give you to the count of three to answer me. If you don't, I will blow your fucking head off." Herndon then cocked the gun and, pointing the gun at Young, began to count. The gun fired immediately after the count of two, the bullet striking Young in the neck at very close range and striking the cinder block wall behind Young. Following a short period of silence, Herndon pointed the gun at Homer and asked appellant who all the rest of the people in the office were. Appellant vouched for all of them. Herndon suggested everyone should keep quiet about what they had witnessed.

Tico and Payne went back into the club and asked the customers and employees to leave and began closing up the place. Meanwhile, Herndon picked up Young's body and carried it out of the office. Jaycon drove Young's car around and opened up the trunk. Herndon placed Young's body in the trunk and closed the trunk lid. Appellant offered the suggestion that Young's body be thrown over a cliff. Herndon and Jaycon then left together, one of them driving Young's car away.

Appellant returned to the bar area and began drinking as Tico and Payne cleaned up the office by dismantling a blood-soaked couch, cutting off part of the carpeting and scrubbing down the walls. All the blood-soaked items were placed in a plastic trash bag and taken out by Homer to be burned at the suggestion of appellant.

On appellant's instructions, Tico and Payne went to the apartments of Lindell and Eggers to warn them that they should remain silent about what they had seen or heard, or run the risk of incurring the same fate. After cleaning up, Tico, Homer and Payne went to appellant's club, the Saddle Bronc, where they saw appellant drinking.

Herndon and Jaycon also cleaned up at Herndon's place, and at about 11:50 p.m. were headed toward appellant's Saddle Bronc Club. While stopped along the side of Farm to Market Road 1585 to burn the clothing Herndon had been wearing at the time of the killing, they were spotted by Texas Department of Public Safety Trooper Max Gunn. Their car was seen parked next to a small fire by the side of the road. Suddenly it took off in an erratic manner at a high rate of speed.

The car was stopped after a three mile chase and both were arrested, Herndon for driving while intoxicated and Jaycon for public intoxication. Officer Gunn noted that Herndon had fresh cut marks about the bridge of the nose and under the left eye.

Texas Department of Public Safety Officer John Salter, in response to a broadcast by Trooper Gunn, proceeded to the location of the fire previously seen next to Herndon's car and discovered a cardboard box containing partially burned items of clothing: a handkerchief, maroon pants, a T-shirt and a white shirt. These items met the description of the clothing alleged to have been worn by Herndon earlier in the day.

At approximately 10:00 p.m., numerous officers responded to a call from Texas Department of Public Safety Trooper Mike Humphreys who, while on patrol of rural highways in the Lubbock area, discovered a vehicle on fire with its trunk lid open and two men standing next to it.[2] The two men were identified as passersby and later released. Young's body, apparently soaked with an unidentified solvent resembling brake fluid, was found in the trunk.

Young's body was removed to a local funeral home where Deputy Sheriff Sonny

---

2. The intense heat of the fire totally destroyed the front end of the vehicle. However, strong winds blowing at the time prevented the flames from reaching the trunk area and, therefore, the trunk was for the most part unaffected.

Keesee and other peace officers examined it. They removed Young's solvent-soaked clothing and tight-fitting boots and observed numerous cuts and bruises and one serious wound on the top rear portion of his head. Upon returning to the Lubbock County Sheriff's office, Keesee ran into Herndon and Jaycon who had been brought there after being arrested by Trooper Gunn. After an hour-long conversation with Jaycon and Herndon, Keesee requested that appellant come in to see him. Appellant voluntarily appeared to talk to Keesee[3] and, when asked about the clothing worn that day by Herndon and Jaycon, appellant gave a description of Herndon's clothing that was similar to that found earlier burning by the side of the road. When questioned about his whereabouts earlier that day appellant stated that he had been at a party at his Saddle Bronc Club. Appellant also admitted being with Jaycon and Herndon earlier in the day and related that Herndon had injured his face while installing an electrical conduit at appellant's place of business.

Deputy Sheriff Dean Bohannon, after investigating the burning vehicle, ran into Herndon and Jaycon at the sheriff's office. He was already acquainted with both of them and observed that both were very neatly dressed and were acting very nervous. Sometime later, in the early hours of December 25, 1977, Bohannon met appellant at the sheriff's office. Appellant related the same information he had told Keesee about Herndon and Jaycon and the injury to Herndon's face. Bohannon noted appellant was acting nervous.

In the early hours of December 26, 1977, Bohannon, Keesee and Ed Barclay, also of the Lubbock County Sheriff's Department, went to the Salt River Saloon in search of evidence. Blood stains were noted on the sidewalk near the saloon doorway leading to the parking lot, and a baseball-type cap was found. Later that morning they returned to obtain blood scrapings from the sidewalk and photographs of the exterior of the building and surrounding area, including the bloodstains on the sidewalk.

On the 27th of December, at approximately 4:00 p.m., Ed Barclay, along with several members of the Texas Department of Public Safety, went to the Salt River Saloon and observed the interior of the saloon and glanced into the office area. He observed that a piece of carpeting had been cut and removed from the area around the door.

On December 28, Barclay spoke with Herndon at the sheriff's office and noticed scabbed scars on his face. He next met with Jaycon on December 30, at Jaycon's trailer home. The same day he spoke to Tico Lowrance at the sheriff's office. All three appeared extremely nervous. After further investigation Barclay talked again with Tico and with Homer and Payne. All three of them appeared to be in fear for their lives. On March 3, 1978, an agreement was reached with Tico, Homer, Payne, their attorney and Barclay that the three would turn State's witnesses against Herndon, Jaycon and appellant.

Chemical tests performed on the blood scrapings taken from the sidewalk outside the Salt River Saloon showed that they were type O human blood, the same type found on Young's clothing and the same type as the blood withdrawn from Young's body at the funeral home. Hair tests conducted on items of clothing, including the baseball cap found outside the Salt River Saloon, indicated a similarity to hair samples taken from Young's body. A test of human tissue taken from Young's body revealed the presence of lead with traces of antimony. A test of scrapings from a cinder block taken from the Salt River Saloon office also revealed the presence of lead with traces of antimony. The metal fragments in both the tissue and cinder block were consistent with the metal in a lead bullet.

The testimony of Tico, Homer and Payne was almost identical with the singular exception that Payne expressed the opinion

---

**3.** Although not a suspect at the time, appellant showed up at Keesee's office with a bondsman and acted very nervous throughout the interview.

that the shooting appeared to her to have been accidental. Lindell and Eggers, testifying for the State as non-accomplice witnesses, related the exact events leading up to the dragging of Young into the office prior to the shooting. Both testified that about 15 minutes after Young was brought to the office, they heard what sounded like a gunshot, and that immediately thereafter Tico came out of the office and informed them to clear the tables because the club was closing.

Both testified that later that evening they were visited by Tico and Payne and advised not to talk about the incident. Payne advised Lindell that she was to say appellant had not been at the club. Lindell recalled going into the office the next day and noticing that part of the carpet was missing and that there had been changes made to the wall. Eggers was instructed by Tico to intentionally write a false statement about the incident and Tico then warned her not to mention the incident. After police had begun to interview both Lindell and Eggers, Tico advised them to stick to the same false story. Both testified they feared for their safety if they were to become involved.

Appellant did not testify. However, Herndon, after being warned by the trial court, elected to present a markedly different version of the events. According to Herndon's version of the events, he spent the morning of December 24, 1977, helping Jaycon move his trailer house from one location to another and then spent the afternoon helping appellant rewire part of appellant's warehouse. While there, appellant received a phone call that someone was going to rob one of his clubs and possibly kill anyone that resisted. Herndon saw appellant leave with Jaycon and ten minutes later decided to go down to the club to assist appellant, if he could.

When he got to the club, Herndon, feeling apprehensive about the threats, removed a gun from the trunk of his car and placed it between his belt and waistband. About that time he spotted appellant and Jaycon driving up. After entering the club, Herndon and Jaycon took their place at a booth with Payne. Appellant sat across the room with Tico and Homer. Herndon recalled that sometime thereafter, one of the girls working at the club came in hollering, "He is out front, he is out there."

Herndon then asked appellant if he wanted him to talk to them[4] and try to settle the problem peacefully. Appellant responded by pointing to a side door. Herndon went out the side door and Jaycon followed him out. Herndon then walked around the building to the front where he saw Young stepping out of his car. As he approached Young, Herndon asked him if he was the man who had come to talk to Tico. Young responded by saying that it was none of his business and struck Herndon in the face. Herndon then pulled out his gun and explained his role in the settlement attempt, but Young was not impressed with Herndon's gun and replied that he had his own gun inside his boot. According to Herndon, Young showed him the top of a pistol sticking out of his boot.

Unimpressed by Herndon's gun, Young walked right by him and headed towards the club's side door. Herndon followed Young and Jaycon fell in behind them as they walked into the club. Herndon immediately grabbed Young's arm and told him not to pull his pistol inside the club because they merely wanted to talk to him. At the same time, Jaycon grabbed Young's other arm. Young allegedly then walked straight to appellant and spat on him. Appellant responded by slapping Young and both began to push each other.

At this point, Homer suggested that they move to the office away from public view and, according to Herndon, Young walked into the office on his own. Inside the office appellant and Young began scuffling again and Herndon separated them by forcing Young to sit down on a small couch and

4. Herndon insisted that Young was expected to be accompanied by his gun carrying motorcycle friends, the "banditos."

making appellant move away from Young. Herndon admitted that Tico, Homer, Payne and Jaycon followed them into the office.

As Young and appellant discussed the subject of missing money, Jaycon was sent out to get some drinks. Young appeared to get angry and at one point threatened to bring his "bandito" friends back that evening to kill everyone there. At about the same time, according to Herndon, Young began to cross his legs and to lean forward as though reaching for the pistol inside his boot. Herndon instinctively stood up, pulled his gun and cocked it. Simultaneously appellant reached out and grabbed at his arm. Herndon claimed to be so frightened by Young's apparent move for his gun that he did not remember pointing his gun at Young. He, nevertheless, insisted that the gun had discharged accidentally as appellant grabbed his arm.

Herndon admitted asking appellant who the others in the room were but denied threatening or pointing his gun at Homer. He further blamed Homer for having made the suggestion that the killing be covered up, and stated that he did not report the shooting to police because Homer and Tico had advised him not to call the police.

Herndon remembered Jaycon driving Young's car away with Young's body in the trunk after he (Herndon) had placed it there. Herndon then went home and cleaned up. While cleaning up, Jaycon showed up soaking wet and out of breath and explained that he had spilled brake fluid on himself while setting Young's car on fire.

According to Herndon, Jaycon then showered and changed clothing. Jaycon placed his clothing, along with Herndon's, in a cardboard box, and while driving back into town, stopped and set the box on fire and threw it into a ditch alongside the roadway. Minutes later their car was stopped and both he and Jaycon were arrested. Herndon admitted that he had lied to police about how he had cut his nose.

Appellant also relied upon the testimony of a firearms expert, Garrett Humphreys, to prove that the type of gun used by Herndon was capable of firing even without the hammer being cocked back.

We turn now to appellant's first ground of error, challenging the admissibility of evidence obtained during two warrantless searches and two searches incident to warrants. While the contentions are presented in an ambiguous and multifarious manner, we address them as best we can.

The first search complained of occurred in the early morning hours of December 26, 1977, when Sheriff's Deputies Bohannon, Keesee and Barclay went to the Salt River Saloon in search of evidence, and noted bloodstains on the sidewalk near the saloon side door leading to the parking lot. Also found at this time was the baseball type cap. Evidence admitted as a result of this "search" consisted primarily of photographs depicting the exterior of the club and the cap.

The second "search" complained of occurred on December 27, 1977, when deputy Barclay and several officers of the Texas Department of Public Safety went to the Salt River Saloon at about 4:00 p.m. while the club was open for business. While there the officers glanced into the office area and made observations. As a result of this "search" a diagram of the office was prepared and admitted into evidence.

On January 11, 1978, the first of two searches, conducted pursuant to search warrants, took place. As a result of this search, two portions of green carpeting were seized from the office of the club. Numerous photographs of the interior of the office were taken.

On January 25, 1978, the second search warrant was executed, resulting in the seizure of numerous items, including a cinder block with a small indentation containing lead shavings. Also recovered were blood samples taken from various locations in the office.

The trial court ruled, after a hearing outside the presence of the jury, that the "searches" conducted on December 26 and 27, 1977, were merely observations made while on public premises.

We agree with the trial court that searches, within the meaning of the Fourth Amendment to the United States Constitution, did not occur on the two occasions categorized as warrantless searches by appellant. A search necessarily implies a prying into hidden places for that which is concealed. It is simply not a search to observe that which is open to view. *Long v. State,* 532 S.W.2d 591 (Tex.Cr.App.1975); *Turner v. State,* 499 S.W.2d 182 (Tex.Cr. App.1973).

For the same reason, photographs depicting areas or items knowingly exposed are not seizures or fruits of a search. *Cf. Fisher v. State,* 259 Ind. 633, 291 N.E.2d 76 (1973); *Sponick v. City of Detroit Police Dept.,* 49 Mich.App. 162, 211 N.W.2d 674 (1973). The Fourth Amendment protects only "reasonable expectations of privacy." *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). *See also Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). In any event, appellant, when presenting his defense through the co-defendant Herndon, made repeated use and references during his testimony to the very diagrams complained of on appeal. In *Brown v. State,* 457 S.W.2d 917 (Tex.Cr.App.1970), it was held that such action during the trial constitutes a waiver of objection.

The search conducted on January 11, 1978, was pursuant to a search warrant issued upon the affidavit of Lubbock Police Officer Goolsby. Affiant Goolsby's information, described as reliable, was obtained from an informant termed credible and otherwise meeting the requirements of *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Under the directives of the warrant, Goolsby was specifically authorized to search for and seize one spent bullet as evidence of the shooting of Young. The search did not produce the spent bullet being sought but it did produce evidence of its presence on the premises.[5]

The search conducted on January 25, 1978, was pursuant to a search warrant

issued once again upon the affidavit of Officer Goolsby. The affidavit was based upon observations Goolsby had made when executing the January 11, 1978, warrant. This second search warrant authorized the seizure of a cinder block in the Salt River Saloon office containing fragments of a spent bullet as evidence of the shooting of Young.

Appellant argues that the affidavit in support of the warrant issued on January 11, 1978, falls short of providing a sufficient basis for a finding of probable cause. We disagree. The affidavit meets the requirements of *Aguilar v. Texas, supra,* in that it provided the reviewing magistrate with underlying circumstances from which the informant concluded that the item sought to be seized was where he claimed it was and also provided some of the underlying circumstances from which the officer concluded that his informant was credible or his information reliable.

The affidavit in support of the warrant issued on January 25, 1978, was made by Officer Goolsby based upon his own observations made while executing the January 11, 1978, warrant. Without specifying how the affidavit is lacking, appellant makes a generalized, blunderbuss challenge to its sufficiency. We fail to see how it is lacking and we fail to discern the nature of appellant's complaint.

Again, appellant generally complains of the use by the State of photographs obtained during the execution of this second warrant. Appellant argues that these photographs were not listed on the return of the warrant as being evidence seized or authorized by law to be seized. He relies on Tex.Code Crim.Pro.Ann. art. 18.01(d) (Vernon 1977) which provides,

Only the specifically described property or items set forth in a search warrant issued under Subdivision (10) of Article 18.02 of this Code or property or items enumerated in Subdivisions (1) through (9) of Article 18.02 of this Code may be

---

5. Seized pursuant to the warrant was a large piece of chewing gum later identified as having

been placed over the indentation in an attempt to conceal the bullet hole.

seized. Subsequent search warrants may not be issued pursuant to Subdivision (10) of Article 18.02 of this Code to search the same person, place, or thing subjected to a prior search under Subdivision (10) of Article 18.02 of this Code.

and on Tex.Code Crim.Pro.Ann. art. 18.02 (Vernon Supp.1981),

A search warrant may be issued to search for and seize:

(1) property acquired by theft or in any other manner which makes its acquisition a penal offense;

(2) property specially designed, made, or adapted for or commonly used in the commission of an offense;

(3) arms and munitions kept or prepared for the purpose of insurrection or riot;

(4) weapons prohibited by the Penal Code;

(5) gambling devices or equipment, altered gambling equipment, or gambling paraphernalia;

(6) obscene materials kept or prepared for commercial distribution or exhibition, subject to the additional rules set forth by law;

(7) drugs kept, prepared, or manufactured in violation of the laws of this state;

(8) any property the possession of which is prohibited by law;

(9) implements or instruments used in the commission of a crime; or

(10) property or items, except the personal writings by the accused, constituting evidence of an offense or constituting evidence tending to show that a particular person committed an offense; or

(11) persons.

He points out that the photographs are not items listed under subdivisions (1) through (10) of art. 18.02 and further points out that they were not even photos of the spent bullet. Appellant categorizes the search as a general exploratory search because of the numerous items seized although not covered by the warrant. Since the items seized and not covered by the warrant were not offered in evidence appellant's complaint as to these items is without merit.

The photographs complained of primarily depict the cinder block with indentation covered by gum. The item depicted was the subject of lengthy testimony during trial. If a verbal description was appropriate we see no reason why a pictorial communication of the same thing should not be admissible if otherwise material and relevant to the issue on trial. *Byrd v. State,* 495 S.W.2d 226 (Tex.Cr.App.1973); *Terry v. State,* 491 S.W.2d 161 (Tex.Cr.App.1973); *Martin v. State,* 475 S.W.2d 265 (Tex.Cr.App.1972); *Lanham v. State,* 474 S.W.2d 197 (Tex.Cr.App.1971). The photographs were properly authenticated as being fair and accurate representations of the scenes which they depict and it was within the discretion of the trial court to decide whether they served a proper purpose in enlightening the jury. *Terry v. State, supra; Lanham v. State, supra.* We find no abuse of discretion.

We are similarly unpersuaded that the photographs constitute a seizure of evidence any more than did the knowledge the officers gained from personal observation, provided the observation was otherwise legally made. *See United States v. Espinoza,* 641 F.2d 153 (4th Cir.1981). Since objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence, and because we hold the search warrant to be a valid one, we conclude that the officers did not exceed the scope of the warrant by making photographs of what was plainly visible for preservation as evidence.

Appellant finally argues that the search warrant issued on January 25, 1978, was invalid because it violated the provisions of Tex.Code Crim.Pro.Ann. art. 18.01(d) (Vernon 1977) in that it permitted a search of the same place or thing subjected to a prior search pursuant to a warrant issued under subdivision (10) of art. 18.02.

The State replies that the earlier search warrant was one predicated upon subdivi-

sion (9) of art. 18.02, in that the spent bullet was an implement or instrument used in the commission of a crime, and, therefore, the State was not precluded from seeking a subsequent search warrant to seize the cinder block. We find it unnecessary in this opinion to address the State's argument since we uphold the validity of this second search warrant based upon different reasoning.

The officers executing the first search warrant would have been justified in seizing the bullet fragment on January 11, 1978, when it was first observed embedded in the cinder block. Rather than run the risk of destroying evidence or exceeding the scope of the first warrant, the officers sought a second warrant to seize the entire cinder block based upon knowledge of its presence gathered from personal observation.

An affidavit of a police officer evidencing sufficient personal knowledge gathered from direct observations may establish probable cause for the issuance of a search warrant if it supplies sufficient underlying facts. *See Rangel v. State,* 435 S.W.2d 143 (Tex.Cr.App.1969). The affidavit of Officer Goolsby recited in relevant part:

I, Ronnie Goolsby, of the Lubbock Police Department, have reason to believe, and do believe, that evidence, to-wit: one cinder block containing fragments from a spent bullet which is evidence pertaining to the murder of William Drew Young III is being unlawfully kept, possessed and concealed at a business located at 2311 19th Street, Lubbock, Lubbock County, Texas, . . .

Affiant's belief is based upon the following: Affiant has personally observed said cinder block to have an indention believed to be that caused by a bullet made at the same time William Drew Young III was shot on December 24, 1977 . . . Affiant personally observed the said cinder block during the serving of a search warrant executed at the above business on January 11, 1978 . . .

We hold Officer Goolsby's affidavit sufficient to support the issuance of the January 25, 1978, search warrant.

We do not believe the Legislature intended to prevent the State from applying for a subsequent search warrant to seize evidence previously observed while executing an earlier search warrant. We believe the evil sought to be prevented by the Legislature was repeated general exploratory searches of the same person, place or thing so as to constitute harrassment. The execution of a subsequent search warrant to seize a particular item already observed would not constitute a search in our opinion, particularly when the item sought to be seized is one kept in plain view, negating an expectancy of privacy.

Had the State seized the entire cinder block under authority of the January 11, 1978, search warrant, no doubt appellant would be complaining today that the State had seized an item not particularly described. *See Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). And since the police officers had probable cause to believe they would find the bullet fragment embedded in the cinder block long before making the seizure and had an opportunity to obtain a warrant, they would not have been justified in making a warrantless seizure.

While the entire cinder block was removed and seized, the only probative value rested in the bullet fragments and the block merely served as a container of necessity. In view of appellant's theory of defense we are not inclined to find error in the admission of or references to the cinder block with bullet fragments as harmful in any event.

Appellant's theory did not refute the actual shooting, the victim's position when shot, nor the steps taken to conceal the incident. Appellant's defense, if believed, would have excused his conduct on the basis of accident. In short, the fact of a bullet being lodged in a wall as a result of a single gun shot was not a contested issue. Appellant's defense conceded this but sought to excuse it.

We hold that the trial court did not err in admitting evidence obtained as a result of

the execution of the search warrant issued on January 25, 1978. There being no error in the trial court's refusal to suppress any of the evidence obtained as a result of the four separate instances complained of, appellant's first ground of error is overruled.

■■■ Appellant next contends that the trial court erred in not granting his requested jury charge on involuntary manslaughter. In support of his contention he directs our attention to Herndon's testimony. We have examined Herndon's entire testimony, both on direct and cross-examination, and we find his position to support only the defense of accident. We have also examined the testimony of appellant's other witnesses, Payne and Garrett Humphreys, and both of them support only the theory of an accidental discharge.

We recognize the well-settled rule that when evidence from any source raises a defensive issue or an issue of a lesser included offense and a charge on the issue is properly requested, the charge must be submitted to the jury. *Branham v. State,* 583 S.W.2d 782 (Tex.Cr.App.1979). But where the evidence raises only the issue that the accused is guilty of the offense charged or not guilty of any offense at all, the issue of the lesser included offense is not raised. *Thomas v. State,* 578 S.W.2d 691 (Tex.Cr. App.1979); *McBrayer v. State,* 504 S.W.2d 445 (Tex.Cr.App.1974). *See also Royster v. State,* 622 S.W.2d 442 (Tex.Cr.App.1981).

A person commits the offense of involuntary manslaughter when he recklessly causes the death of an individual. Tex.Penal Code Ann. § 19.05(a)(1) (Vernon 1974). "Recklessly" is defined in Tex.Penal Code Ann. § 6.03(c) (Vernon 1974) as follows:

A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances as viewed from the actor's standpoint.

Since involuntary manslaughter requires a lesser culpable mental state on the part of the actor, it is by definition a lesser included offense of murder. *See* Tex.Code Crim. Pro.Ann. art. 37.09 (Vernon 1981); *Brooks v. State,* 548 S.W.2d 680 (Tex.Cr.App.1977).

The evidence raised by appellant through his defense did not establish that he consciously disregarded the risk of pointing and shooting the pistol at the deceased. The appellant maintained that the gun accidentally discharged as he grabbed at Herndon's arm as Herndon prepared to shoot at the deceased. The evidence did not raise the issue of involuntary manslaughter. *Cf. Simpkins v. State,* 590 S.W.2d 129 (Tex.Cr. App.1979); *See also Thomas v. State, supra.* Appellant's second ground of error is overruled.

■■■ In his final ground of error appellant contends the trial court should have instructed a verdict of acquittal because the evidence at the time the State rested its case was insufficient to corroborate the accomplice testimony used to convict him.

The jury was properly instructed on the law of parties under Tex.Penal Code Ann. § 7.01 (Vernon 1974) and on the law of criminal responsibility for the conduct of another under Tex.Penal Code Ann. § 7.02(a)(2) (Vernon 1974). Additionally, the trial court correctly qualified its application of the law to the facts of the case by instructing the jury that Tico and Homer Lowrance and Jan Payne were accomplice witnesses as a matter of law and that a conviction could not be had upon the testimony of an accomplice unless that testimony was corroborated by other evidence tending to connect appellant with the offense committed, and that the corroboration was not sufficient if it merely showed the commission of the offense. *See* Tex.Code Crim.Pro.Ann. art. 38.14 (Vernon 1979); *Infante v. State,* 612 S.W.2d 603 (Tex.Cr.App. 1981).

Appellant argues that the only evidence the State can look to for corroboration is

that of Eggers and Lindell and claims that outside of the testimony of accomplice witnesses, the record is devoid of any acts committed by appellant that would indicate his responsibility for Herndon's conduct. Although we understand appellant's challenge to be limited to the sufficiency of the evidence at the time his motion for instructed verdict was made and not to the sufficiency of the evidence to support his conviction, it is well-settled that the question of the sufficiency will be determined from all of the evidence. *Vera v. State,* 428 S.W.2d 664 (Tex.Cr.App.1968); *Bellah v. State,* 415 S.W.2d 418 (Tex.Cr.App.1967); *Lopez v. State,* 172 Tex.Cr.R. 317, 356 S.W.2d 674 (Tex.Cr.App.1962); *Cross v. State,* 100 Tex. Cr.R. 88, 271 S.W. 621 (1925).

The test as to the sufficiency of the corroboration is to eliminate from consideration the evidence of the accomplice witnesses, and then to examine the evidence of the other witnesses to ascertain if it is of incriminating character which tends to connect the defendant with the commission of the offense. If there is such evidence, the corroboration is sufficient, otherwise it is not. *Pinson v. State,* 598 S.W.2d 299 (Tex. Cr.App.1980); *Shannon v. State,* 567 S.W.2d 510 (Tex.Cr.App.1978); *Brown v. State,* 561 S.W.2d 484 (Tex.Cr.App.1978). However, the corroborative testimony need not directly link the accused to the crime or be sufficient in itself to establish guilt. *Lyman v. State,* 540 S.W.2d 711 (Tex.Cr.App.1976); *Bentley v. State,* 520 S.W.2d 390 (Tex.Cr. App.1975). The corroboration need only make the accomplice's testimony more likely than not to be true, *James v. State,* 538 S.W.2d 414 (Tex.Cr.App.1976), and it is not necessary that an accomplice be corroborated on all his testimony. *Shannon v. State, supra; Edwards v. State,* 427 S.W.2d 629 (Tex.Cr.App.1968).

The testimony of Eggers and Lindell is almost identical to that of the accomplice witnesses insofar as it places appellant inside the Salt River Saloon immediately preceding and following the killing. Their testimony establishes the hostilities immediately preceding the fatal shooting and fully corroborates the testimony of the accomplice witnesses in that regard.

Proof that the accused was at or near the scene of the crime at or about the time of its commission is admissible in corroboration of the testimony of the accomplice, and may tend to connect the accused with the commission of the crime, so as to provide sufficient corroboration to support a conviction, when coupled with suspicious circumstances. *Pinson v. State, supra; Shannon v. State, supra; Cawley v. State,* 166 Tex. Cr.R. 37, 310 S.W.2d 340 (1957). *See also Infante v. State, supra* and *Browning v. State,* 451 S.W.2d 234 (Tex.Cr.App.1970) holding that evidence of presence at the scene from other than accomplice witnesses is sufficient under art. 38.14 to sustain the conviction. It is also a circumstance tending to prove that one is a party to a crime. *Alexander v. State,* 607 S.W.2d 551 (Tex.Cr. App.1980); *Coronado v. State,* 508 S.W.2d 373 (Tex.Cr.App.1974).

We hold that the testimony of the State's witnesses, excluding that of the accomplices Tico Lowrance, Homer Lowrance, and Jan Payne, is of incriminating character which tends to connect appellant with the commission of the charged offense. It is, therefore, sufficient corroboration of the accomplice testimony.

But we need not limit our examination of the record to the testimony of Eggers and Lindell in the search for corroboration. Appellant recalled the witness Payne as his own witness to establish appellant's theory of accidental discharge of the pistol and to that extent she would not be considered an accomplice witness requiring corroboration. *Burns v. State,* 123 Tex.Cr.R. 213, 57 S.W.2d 836 (1932); *Puryear v. State,* 56 Tex.Cr.R. 231, 118 S.W. 1042 (1909). Moreover, by presenting the testimony of co-defendant Herndon, an accomplice as a matter of law, as his witness, appellant eliminated the need for corroboration of his testimony. *Daviss v. State,* 162 Tex.Cr.R. 280, 284 S.W.2d 713 (1955); *Williams v. State,* 37 S.W. 325 (Tex.Cr.App.1896); *Joseph v. State,* 34 Tex.Cr.R. 446, 30 S.W. 1067 (1895). The testimony of the accomplices made out

a complete case against appellant. Similarly, when the testimony of Herndon and Payne, as defense witnesses, is considered alone, all of the elements of the crime charged are established independent of the accomplice testimony, except the element of intent. The intent of an accused is rarely shown by direct and positive evidence, its existence being rather an inference of fact to be ascertained and found by the trier of fact from the circumstances shown by the evidence in the case. *Binyon v. State,* 545 S.W.2d 448 (Tex.Cr.App.1976).

Because the State relied upon the theory of parties, the evidence must be found sufficient to establish that appellant acted with intent to promote or assist in the commission of the offense by soliciting, encouraging, directing, aiding, or attempting to aid the other person or persons in its commission, Tex.Penal Code Ann. § 7.02(a)(2) (Vernon 1974), *Curtis v. State,* 573 S.W.2d 219 (Tex.Cr.App.1978); *Baldridge v. State,* 543 S.W.2d 639 (Tex.Cr.App.1976); *Suff v. State,* 531 S.W.2d 814 (Tex.Cr.App.1976), but this can be done by circumstantial evidence. *Morrison v. State,* 608 S.W.2d 233 (Tex.Cr.App.1980); *Wygal v. State,* 555 S.W.2d 465 (Tex.Cr.App.1977); *Ex parte Prior,* 540 S.W.2d 723 (Tex.Cr.App.1976). Furthermore, we may review the evidence touching upon events before, during and after commission of the offense. *Wygal v. State, supra; Holloway v. State,* 525 S.W.2d 165 (Tex.Cr.App.1975). The fact that appellant did not participate in the actual pulling of the trigger in shooting the deceased is immaterial. *Ex parte Prior, supra; Bush v. State,* 506 S.W.2d 603 (Tex. Cr.App.1974).

In reviewing appellant's participation as a party, we may place reliance on actions which show an understanding and common design to do a certain act. *Ex parte Prior, supra; Bush v. State, supra.* Whether words evidencing such an agreement were uttered between appellant and his co-defendants is of no consequence. *Barron v. State,* 566 S.W.2d 929 (Tex.Cr.App.1978).

The corroborated evidence established appellant's conscious election, along with Herndon and Jaycon, to inflict bodily injury upon Young. It does not matter that the offense originally intended by appellant, assault or aggravated assault, subsequently escalated into murder. Where several people act together in pursuit of an unlawful act each one is liable for collateral crimes even though unplanned and unintended, if those crimes are the foreseeable, ordinary and probable consequences of the preparation or execution of the unlawful act. *Thompson v. State,* 514 S.W.2d 275 (Tex.Cr.App.1974). Inasmuch as death would have been a foreseeable consequence of an assault inflicted by the use of a gun, appellant was liable for the collateral crime of murder whether or not there existed any prior agreement to commit the latter offense. *Thompson v. State, supra. See also* Tex.Penal Code Ann. § 6.04(b)(1) (Vernon 1974). In view of the testimony of the accomplice witnesses that appellant uttered words showing an intent to cause Young's death, the jury was justified in believing that appellant intended such a result.

We hold that the evidence, when viewed in the light most favorable to the verdict, *Morrison v. State, supra,* is sufficient to show that appellant, by participating in the beating of Young, subsequently aided or attempted to aid Herndon in the resulting murder of Young. The challenge to the sufficiency of corroboration in appellant's third ground of error is overruled and the judgment is affirmed.